482-14/MF/PJG
FREEHILL HOGAN & MAHAR, LLP
*Attorneys for Plaintiff*
Hapag-Lloyd Aktiengesellschaft
80 Pine Street
New York, NY 10005
(212) 425-1900 / (212) 425-1901 (Fax)
Peter J. Gutowski, Esq.
Michael Fernandez, Esq.



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HAPAG-LLOYD AKTIENGESELLSCHAFT,

                    Plaintiff,

    -against-

O'ROURKE MARINE SERVICES L.P., L.L.P., O.W.
BUNKER GERMANY GMBH, O.W. BUNKER USA,
INC., ING BANK N.V.,

                    Defendants.

14 Civ. _____

**COMPLAINT FOR
INTERPLEADER**

      Plaintiff Hapag-Lloyd Aktiengesellschaft, by its attorneys Freehill Hogan & Mahar LLP,

files its Complaint for Interpleader pursuant to 28 U.S.C. §§1335 and 2361 against O'Rourke

Marine Services L.P., L.L.P., O.W. Bunker Germany GmbH, O.W. Bunker USA, Inc., and ING

Bank N.V., and respectfully alleges upon information and belief as follows:

### THE PARTIES

    1.    Plaintiff Hapag-Lloyd Aktiengesellschaft (hereinafter "HLAG") is an entity

organized and existing under the laws of a foreign country with its principal place of business at

Ballindaum 25, D-20095 Hamburg, Germany.

426957.1

2.      Defendant O'Rourke Marine Services L.P., L.L.P. (hereinafter "O'Rourke") is an entity organized and existing under the laws of Texas with its principal place of business at 223 McCarty Dr., Houston, Texas 77029.

3.      Defendant O.W. Bunker Germany GmbH (hereinafter "OW Germany") is an entity organized and existing under the laws of a foreign country with its principal place of business at Neumühlen 11, 22763 Hamburg, Germany.

4.      Defendant O.W. Bunker USA, Inc. (hereinafter "OW USA") is an entity organized and existing under the laws of a Texas with its principal place of business at 2603 Augusta Dr., Suite 440, Houston, Texas 77057.

5.      Defendant ING Bank N.V. (hereinafter "ING") is an entity organized and existing under the laws of a foreign country with its principal place of business at Amsterdam Poort, Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands, and does business in this jurisdiction.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1333, and this action involves an admiralty and maritime claims under Fed. R. Civ. P. 9(h), inasmuch as this action involves competing claims to the payment for marine bunkers provided to two ocean-going vessels owned and/or operated by HLAG.

7.      This Court also has jurisdiction over this interpleader action pursuant to 28 U.S.C. §1335 in that: a) at least two of the claimants are of diverse citizenship; b) the dispute between the claimants involves funds in an amount exceeding $500.00, exclusive of interest and costs; and c) HLAG is the stakeholder of the funds and is prepared to file the bond required by §1335, covering amounts claimed against HLAG as more particularly described below.

8.     This Court has personal jurisdiction over Defendant O'Rourke pursuant to 28 U.S.C. §2361 and Rule 4(k) of the Federal Rules of Civil Procedure. Additionally, this Court has jurisdiction over O'Rourke pursuant to the OW Bunker Group Terms and Conditions of sale for Marine Bunkers (hereinafter "OW Terms and Conditions").

9.     This Court has personal jurisdiction over Defendant OW Germany pursuant to the OW Terms and Conditions. Additionally, OW Germany continuously and systematically conducts business and/or transacts business in the United States as to the supply of marine bunkers to vessels for purposes of jurisdiction under Fed R. Civ. P. 4(k).

10.     This Court has personal jurisdiction over Defendant OW USA pursuant to 28 U.S.C. §2361 and Rule 4(k) of the Federal Rules of Civil Procedure. Additionally, this Court has jurisdiction over OW USA pursuant to the OW Terms and Conditions.

11.     This Court has personal jurisdiction over Defendant ING to the extent that it is or may be a third-party beneficiary of the bunker supply contracts at issue in this dispute, and to the extent that it is an alleged assignee of the receivables of OW Germany and OW USA. Alternatively, this Court has personal jurisdiction over ING pursuant to New York CPLR §301 as ING is engaged in continuous and systematic business within the State of New York through its New York subsidiary at 1325 Avenue of the Americas, New York, New York 10019.

12.     Venue is proper in this District under 28 U.S.C. §1397 and/or the OW Terms and Conditions.

### FACTUAL BACKGROUND

13.     HLAG is the time charterer/operator of the DERBY D and the manager/operator of the SYDNEY EXPRESS (collectively the "Vessels"), and had all obligations with respect to the purchase and payment for the supply of bunkers to both of the Vessels.

14.     On or about January 1, 2014, HLAG contracted with OW Germany for the supply of marine bunkers ("bunkers") to vessels during the contract term of January 1, 2014, to December 31, 2014. A copy of the contract between HLAG and OW Germany (hereinafter "HLAG Marine Fuel Contract") and the OW Terms and Conditions as previously referenced are attached hereto as Exhibit 1.

15.     Thereafter, HLAG placed orders with OW Germany for the delivery of bunkers to, *inter alia*, the Vessels.

16.     In the normal course of business, HLAG would remit payment to OW Germany for bunkers supplied under the HLAG Marine Fuel Contract. Whatever payment arrangements may have existed downstream of OW Germany to its affiliates and/or subcontractors was unknown to HLAG.

<u>THE DERBY D</u>

17.     In or about late October and/or early November 2014, HLAG submitted to OW Germany an order for the supply of bunkers to the M/V DERBY D, and bunkers were provided at the Port of Houston, Texas, ostensibly by O'Rourke.  (Copies of the relevant purchase, sale and delivery documents are annexed hereto as Exhibit 2.)

18.     HLAG has not been invoiced by OW Germany for the bunkers supplied to the DERBY D.

19.     HLAG has received notification from O'Rourke that it invoiced OW USA $39,102.90 for the bunkers supplied to the DERBY D but has not been paid and has therefore demanded that HLAG remit payment in the aforesaid amount to O'Rourke.

20.     HLAG has made no payment with respect to the supply of bunkers to the DERBY D, and competing claims have been or may be made by Defendants against HLAG and/or that

vessel asserting entitlement to the payment from HLAG.  Threats have also been made to arrest the vessel.

### THE SYDNEY EXPRESS

21.    In or about late October and/or early November 2014, HLAG submitted to OW Germany an order for the supply of bunkers to the M/V SYDNEY EXPRESS, and bunkers were provided at the Port of Houston, Texas, ostensibly by O'Rourke.  (Copies of the relevant purchase, sale and delivery documents are annexed hereto as **Exhibit 3.**)

22.    HLAG has been invoiced $136,000.00 by OW Germany for the bunkers supplied to the SYDNEY EXPRESS.

23.    HLAG has received notification from O'Rourke that it invoiced OW USA $140,224.39 for the bunkers supplied to the SYDNEY EXPRESS but has not been paid and has therefore demanded that HLAG remit payment in the aforesaid amount to O'Rourke.

24.    HLAG has made no payment with respect to the supply of bunkers to the M/V SYDNEY EXPRESS, and competing claims have been or may be made by Defendants against HLAG and/or that vessel asserting entitlement to the payment from HLAG.  Threats have also been made to arrest the vessel.

### CAUSE OF ACTION – INTERPLEADER WITH RESPECT TO THE M/V DERBY D AND M/V SYDNEY EXPRESS

25.    Plaintiff repeats and reasserts each and every allegation set forth above in paragraphs 1-24, inclusive, as if fully set forth at length herein.

26.    There are various competing interests for the amounts due and owing by HLAG for the bunkers supplied to the DERBY D and SYDNEY EXPRESS, including but not limited to a claim by OW Germany and/or OW USA for payment under the HLAG Marine Fuel Contract (Ex. 1), a claim by ING as purported assignees and/or secured parties, and a claim by O'Rourke,

426957.1                                   5

the purported physical supplier of the bunkers, asserting a maritime lien against these two vessels.

27.    HLAG is unsure of which party to pay for the bunkers supplied to these two vessels and accordingly has not made any payments to anyone in response to the competing demands.

28.    Based on the foregoing, HLAG, a disinterested stakeholder, has been and will be subject to multiple claims for payment for the bunkers supplied to the DERBY D and the SYDNEY EXPRESS, and the interests of the defendants in the property subject to this interpleader are adverse as there is a dispute as to which entity or entities are entitled to payment from HLAG for the bunkers.

29.    HLAG has a reasonable fear of multiple liabilities because of these adverse claims including, but not limited to, the threat of *in rem* seizure of the Vessels or other property owned or operated by HLAG.

30.    In accordance with 28 U.S.C. §1335(a)(1) and 28 U.S.C. §2361, HLAG has or will post a bond covering and securing the indebtedness to the appropriate party (once determined by the Court), and is therefore entitled to relief in the form of: (a) an order compelling any and all claimants, including Defendants, to file in this proceeding their claims for payment for the bunkers supplied; (b) an order, in accordance with 28 U.S.C. §1335(a)(1) and §2361, precluding the commencement of or continuation of any action or proceeding anywhere to recover payment relating to the supply of the bunkers, including but not limited to arrest, attachment or other restraint of the vessels or any other property of HLAG; and (c) ultimately, an order determining the party or entity to which payment should be made and discharging HLAG

from any liability after payment (as secured by the bond) is effected to the party or entity so designated by the Court to receive the payment for the supply of the bunkers to the Vessels.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff HLAG respectfully prays that:

1.     Process in due form be issued to the defendants citing them to appear and answer the complaint, failing which a default can be taken;

2.     Approve the bond tendered by HLAG;

3.     Issue an immediate order, in accordance with 28 U.S.C. §1335(a)(1) and §2361, precluding the commencement of or the continuation of any action or proceeding anywhere by the defendants (or any number of them) to recover payment relating to the supply of the bunkers, including but not limited to an order precluding the arrest, attachment or other restraint of the vessels DERBY D and SYDNEY EXPRESS or any other property of HLAG or the owners of the Vessels or any other entity within the same management;

4.     Direct the defendants to file their claims for payment related to the supply of bunkers to these vessels in these proceedings for the Court to adjudicate the proper entity to which payment is due; and

5.     Declare, upon such determination and payment, as secured by the bond, that HLAG is discharged from all liability with respect to the supply of the bunkers as to all other parties and entities; and

3.     That HLAG be awarded such other and further relief which this Court may deem just and proper including but not limited to the attorneys fees and costs to which HLAG is entitled under the relevant statutes.

Dated: New York, NY
December 19, 2014

Respectfully Submitted,

Peter J. Gutowski
Michael Fernandez
80 Pine Street
New York, NY 10005
(212) 425-1900 / (212) 425-1901 (Fax)
*Attorneys for Plaintiff,*
*Hapag-Lloyd Aktiengesellschaft*

# Exhibit 1



# ARA - Contract

| | |
|---|---|
| Seller | : OW Bunker Germany GmbH |
| Buyer | : Hapag Lloyd AG, Hamburg |
| Port of delivery | : Antwerp (ANR)<br>Rotterdam (RTD) |
| Contract term | : January 1st – December 31st 2014 |

| No. | Product | Antwerp | Rotterdam | Lot size min | Lot Size max | Formula | Rebate / Premium FIXED |
|---|---|---|---|---|---|---|---|
| 1 | RMG 380, max.3,50% Sulfur | 150.000 | 15.000 | 300 | 5.000 | Low on Platts "FOB RDAM BARGES, 3.5 PCT HSFO" | - 2,00 |
| 2 | RMK 700 or RMK 500 or RMG 380, max. 1,00% sulfur | 25.000 | 35.000 | 200 | 2.000 | Low on Platts "FOB RDAM BARGES, 1.0 PCT HSFO" | - 2,00 |
| 5 | RMK 500 or RMG 380, max. 1,00% sulfur | 50.000 | 10.000 | 200 | 2.000 | Low on Platts "FOB RDAM BARGES, 1.0 PCT HSFO" | - 2,00 |
| 6 | RMG 380, max. 1,00% sulphur | 140.000 | 20.000 | 200 | 2.000 | Low on Platts "FOB RDAM BARGES, 1.0 PCT HSFO" | - 2,00 |
| 7 | DMZ max. 0,10% sulphur or DMA max.0,10% sulphur | 20.000 | 20.000 | 90 | 500 | Low on Platts "FOB RDAM BARGES, GASOIL 0,1% " | - 32,00 |

The above mentioned quantities are indicative and the buyer is allowed to exceed or reduce the quantities along with buyers requirements in the above mentioned ports by +/-20%,

| | |
|---|---|
| Preplanning | : monthly preplanning schedule to be sent in advance (at least 5 days before the end of the month) for the following month |
| Nomination | : minimum 7 working days prior to ETA, |
| Pricing | : 4 working days prior to ETA. |
| Quality | : Antwerp:   ISO 8217:2010 (E)<br>Rotterdam:  ISO 8217:2010 (E) |
| Quality guarantee | : Seller guarantees a max claim rate of 3% of total supplied volume, in case  seller exceed the max claim rate an additional discount of 0,25 usd/mt to apply on all supplied volume. This will be calculated on a quarterly basis. A claim is determined as a supply conducted outside the product specification stated in the contract. Volume differences due to density excluded. |



| | |
|---|---|
| Contract KPI's | Each contract will be evaluated on quarterly Quality meetings with participation of the relevant stakeholders from both the buyer and seller |
| Sulphur level | : 3,50%  1,00% |
| Confidence level 97,50% | : 3,29%  0,93% |
| Max. CCAI limits | : RMG 380 max. 855 |
| | RMK 500 max. 870 |
| | RMK 700 max. 870 |
| Energy | : Specific Energy as per ISO parameters (net calorific energy) of 40.00 MJ/Kg for all Marine Fuel Oils is aimed but not guaranteed (especially for RMK products). |
| Quality | : Seller has to ensure the product delivered is derived from petroleum crude oil and must neither contain contaminants (i.e. chemical waste, polypropylene, used lubricants, abrasive materials) nor blending components derived from coal and shale distillations processes. In case analysis from legal sample shows any added substances like DCPD, Styrene, Phenol, 1-Butanol, Indene, 1 Phenyl-ethanol seller is fully responsible for all possible consequences including but not limited to direct and indirect damages to the vessel's engine. |
| Sulphur | : LSFO fitted for use in SECA's. In case first analysis exceeds 1,00 % level, the result of the representative sample, sealed and signed by both parties will be final and binding for all parties. |
| Payment Terms | : 30 days after delivery |
| Max. claim notice period | : 60 CALENDAR DAYS OF THE DATE OF DELIVERY FOR TERM CONTRACTED LOW SULPHUR FUEL OIL SUPPLIES IN ANTWERP OR ROTTERDAM. 30 CALENDAR DAYS OF THE DATE OF DELIVERY FOR SUPPLIES IN ALL REMAINING PORTS WORLD WIDE |
| Termination period | : 60 days from both sides otherwise till end of 2014 |
| Terms and Conditions | : Hapag Lloyd AG's standard terms and conditions version 2014 to apply. (version 7.11,3849.00 15623934) |
| Non disclosure | : Buyer and seller agrees that it will keep the pricing terms of this contract confidential |

O.W. BUNKER GERMANY GMBH
Neumühlen 11
D - 22763 Hamburg
Phone +49 40 38 06 80 0 . Fax +49 40 03 04 71
Email: hamburg@owbunker.de

Hapag Lloyd AG
(Buyer)

O.W. Bunker Germany GmbH
(Seller)

7.1424ac090 1602304

# ≫ Hapag-Lloyd

## MARINE FUEL OIL TERMS & CONDITIONS OF PURCHASE

THROUGHOUT THIS CONTRACT THE FOLLOWING DEFINITIONS SHALL APPLY TO THESE PURCHASE TERMS:

| | | | |
|---|---|---|---|
| • BUYERS | : | HAPAG-LLOYD AG | GERMANY |
| | | KRUZFAHRTEN GMBH | 20095 HAMBURG |
| | | BALLINDAMM 25 | |
| | OR | | |
| | | HAPAG-LLOYD | GERMANY |
| | | KRUZFAHRTEN GMBH | 20095 HAMBURG |
| | | BALLINDAMM 25 | |
| • SHLERS | : | THE COMPANY FROM WHOM THE BUYERS PURCHASE THE MARINE FUELS. | |
| • SUPPLIERS | : | THE COMPANY FROM WHOM THE SELLERS PROCURE THE SUPPLY OF MARINE FUELS. | |

• MARINE DISTILLATE OIL AND MARINE FUEL OIL:

AS PER ISO 8217 (LATEST EDITION) STANDARD PETROLEUM PRODUCTS - FUELS CLASS F, IN WHICH PROVISIONS SHALL BE DEEMED INCORPORATED HEREIN, SPECIFICATIONS OF MARINE FUELS AS WELL AS ANY SUBSEQUENT AMENDMENTS THEREOF, HEREINAFTER REFERRED TO AS "FUEL".

### 2. APPLICATION AND ENTIRE AGREEMENT PROVISIONS

THESE PURCHASE TERMS SHALL APPLY TO ANY PURCHASE CONTRACT BETWEEN THE BUYERS AND THE SELLERS FOR "FUEL" AND SUPERSEDE ALL PRIOR AGREEMENTS, ARRANGEMENTS, REPRESENTATIONS (AND MISREPRESENTATIONS) AND STIPULATIONS HOWSOEVER OCCURRING IN RESPECT OF THE SAME SUBJECT, WHETHER MADE IN WRITING OR ORALLY AND FUTURE CHANGES TO THESE PURCHASE TERMS MAY ONLY BE MADE IN WRITING AND MUST BE SIGNED BY BOTH PARTIES.

### 3. APPLICATION OF THE SINGAPORE BUNKERING PROCEDURE (SBP)

WHERE DELIVERY OF "FUEL" IS CARRIED OUT BY BARGES/TANKERS IN SINGAPORE, THE DELIVERY OPERATION SHALL FOLLOW THE PROCEDURES PRESCRIBED BY THE SINGAPORE BUNKER PROCEDURE (LATEST EDITION, ISSUED BY SINGAPORE NATIONAL SHIPPING ASSOCIATION WHICH PROVISIONS SHALL BE DEEMED INCORPORATED HEREIN.

### 4. DOCUMENTATION

BEFORE COMMENCEMENT OF DELIVERY THE SELLERS SHALL PRESENT FOR ACKNOWLEDGMENT BY THE MASTER OF THE VESSEL, OR HIS REPRESENTATIVE, A BUNKER REQUISITION OR SIMILAR DOCUMENT DULY SIGNED BY THE SELLERS OR THEIR REPRESENTATIVES, WHICH SHALL CONTAIN THE QUANTITIES TO BE DELIVERED AND ALL INFORMATION REQUIRED IN ACCORDANCE WITH IMO/ISO RECOMMENDATIONS AND SPECIFICATIONS, INCLUDING IN PARTICULAR:

ACTUAL VALUES FOR:
• VISCOSITY
• DENSITY
• WATER CONTENT
• SULPHUR CONTENT
• FLASHPOINT
• DELIVERY TEMPERATURE
• POUR POINT

IN ADDITION, AND IF AVAILABLE, SIMILAR INFORMATION SHALL BE PROVIDED FOR ALUMINIUM/SILICON, VANADIUM AND ASH CONTENT.

ONCE THE DELIVERY IS COMPLETED AND QUANTITIES MEASURED, A RECEIPT SHALL BE SIGNED AND STAMPED BY THE MASTER OF THE VESSEL, AND RETURNED TO THE SELLERS OR HIS REPRESENTATIVE, AS ACKNOWLEDGEMENT OF THE DELIVERY ONLY AND A DUPLICATE COPY SHALL BE RETAINED BY THE VESSEL. THIS RECEIPT SHALL NOT IN ANY WAY BE CONSTRUED AS ACCEPTANCE BY THE BUYERS OF THE INFORMATION CONTAINED THEREIN, INCLUDING:



* DELIVERED QUANTITY IN VOLUME UNITS AT ACTUAL TEMPERATURE
* ACTUAL DELIVERY TEMPERATURE
* DELIVERED QUANTITY IN VOLUME AT 15 DEGR. C.
* DENSITY IN KG/CBM AT 15 DEGR. C.
* DELIVERED QUANTITY IN WEIGHT UNITS.
* FLASHPOINT
* SULPHUR CONTENT IN % M/M

5. QUANTITY

THE QUANTITY OF "FUEL" DELIVERED SHALL BE DETERMINED BY DIPPING OF TANKS OR METER READING AND
CARGO TEMPERATURE READING OF THE BARGES/TANKERS TANKS EFFECTING DELIVERY.
IN CASE DELIVERY WILL TAKE PLACE FROM SHORESIDE THE QUANTITY THEN SHALL BE DETERMINED BY METER
READING.
THE SELLERS' FIGURES, HOWEVER, SHALL NOT BE REGARDED AS CONCLUSIVE OR BINDING, AND THE BUYERS SHALL
HAVE THE RIGHT TO PROVE THAT THE FIGURES SHOWN IN THE BUNKER DELIVERY RECEIPT ARE INCORRECT.
SELLERS SHALL INVITE BUYERS REPRESENTATIVE TO WITNESS THE DELIVERY PROCEDURE.
THE FINDINGS OBTAINED AND NECESSARY ADJUSTMENTS IN VOLUME SHALL BE CALCULATED IN ACCORDANCE
WITH THE ASTM-IP PETROLEUM MEASUREMENT TABLES.
MASTER OR HIS REPRESENTATIVE SHALL SIGN THE BUNKER DELIVERY RECEIPT FOR ACTUAL VOLUME AND ACTUAL
DELIVERY TEMPERATURE ONLY, BUT NOT FOR THE DENSITY SHOWN IN THE BUNKER DELIVERY RECEIPT.
MASS IN VACUUM OR WEIGHT IN AIR SHALL BE SUBJECT TO VERIFICATION OF DENSITY OR WEIGHT FACTOR
RESPECTIVELY BY ANALYSIS OF VESSEL'S RETAINED SAMPLE.
IF DISCREPANCIES ARISE BETWEEN SUPPLIERS AND BUYERS AS TO QUANTITIES OF "FUEL" SUPPLIED, SUCH
DISCREPANCIES SHALL HAVE TO BE DISCUSSED BETWEEN BUYERS AND SELLERS WITH A VIEW TO FINDING A FAIR
AND REASONABLE SOLUTION, FAILING WHICH CLAUSE 13 SHALL APPLY.

6. QUALITY/GRADE

THE BUYERS SHALL HAVE THE SOLE RESPONSIBILITY FOR THE NOMINATION OF THE GRADES OF MARINE FUEL OIL
SUITABLE TO THE VESSEL AND SHALL STATE THE GRADES REQUIRED IN THE NOMINATION ORDER.
THE SELLERS WARRANT THAT THE MARINE FUEL OIL SHALL BE OF A HOMOGENEOUS AND STABLE NATURE AND
SHALL COMPLY WITH THE ISO GRADE NOMINATED BY THE BUYERS. SELLERS WARRANT, AND BUYERS RELY ON
SELLERS' EXPERTISE IN PROVIDING SUCH A WARRANTY, THAT THE FUEL SUPPLIED WILL NOT ONLY MEET THE
RELEVANT ISO CRITERIA FOR THE GRADE OF FUEL SUPPLIED BUT WILL ALSO BE FIT AND/OR SUITABLE FOR THE
PURPOSE OF PARTICULAR ENGINE INTENDED.
THE MARINE FUEL OIL SHALL IN ALL OTHER RESPECTS COMPLY WITH ISO STANDARDS #2172010 AND ANY
SUBSEQUENT AMENDMENTS THEREOF.

7. DELIVERY

THE "FUEL" SHALL BE DELIVERED TO THE VESSEL EX WHARF OR EX LIGHTER IN THE OPTION OF THE BUYERS OR
BUYERS REPRESENTATIVES IN CASE BOTH ALTERNATIVES EXIST.

IF DELIVERY BY BARGE IS REQUESTED, THE SELLERS WILL ARRANGE FOR SUFFICIENT BARGE AND PUMPING
CAPACITY FOR TIMELY AND SPEEDY DELIVERY.

THE LIGHTERAGE CHARGE TO BE FOR THE BUYERS ACCOUNT, UNLESS THE PRICES ARE QUOTED FREE DELIVERED TO
BUYERS VESSEL.

DELIVERY SHALL BE MADE AT DAY- AND NIGHT-TIME, SUNDAYS AND HOLIDAYS IF NECESSARY AND AS LONG AS
ALLOWED BY APPLICABLE LOCAL LAWS OR REGULATIONS.

THE SELLERS SHALL BE IN POSSESSION OF ALL LICENCES, PERMISSIONS, AUTHORISATIONS, CONSENTS AND PERMITS
REQUIRED TO COMPLY WITH ALL RELEVANT APPLICABLE LAWS, ENACTMENTS, ORDERS, REGULATIONS AND ALL
OTHER INSTRUMENTS RELATING TO THE SUPPLY AND DELIVERY OF MARINE "FUEL" AT THE PORT OR PLACE OF
DELIVERY AND SHALL SUBJECT TO LOCAL LAWS PERMITTING, AND BE RESPONSIBLE TO MAKE ALL CONNECTIONS
AND DISCONNECTIONS BETWEEN THE DELIVERY HOSE(S) AND THE VESSEL'S INTAKE PIPE AND TO ENSURE THAT
THE HOSE(S) ARE PROPERLY SECURED TO THE VESSEL'S MANIFOLD PRIOR TO THE COMMENCEMENT OF DELIVERY.

8. BOOMING

BOOMING TO BE ARRANGED BY SELLERS/ SUPPLIERS ACCORDING TO ALL REQUIREMENTS OF ALL APPLICABLE
LOCAL LAWS AND REGULATIONS.



**9. SURVEY**

EVERY "FUEL" DELIVERY WILL   BE ATTENDED BY AN INDEPENDENT SURVEY COMPANY APPOINTED BY THE BUYERS.
BUYERS WILL BEAR THE COSTS OF SUCH SURVEY.

**10. SAMPLING**

THE SELLERS SHALL ARRANGE AT LEAST SIX (6) IDENTICAL REPRESENTATIVE SAMPLES OF EACH GRADE OF THE
"FUEL" ( INCLUDING ONE (1) MARPOL SAMPLE) TO BE DRAWN THROUGHOUT THE ENTIRE BUNKERING OPERATION IN
THE PRESENCE OF BOTH THE SUPPLIERS AND THE BUYERS OR THEIR RESPECTIVE REPRESENTATIVES.

THE SAMPLES SHALL BE DRAWN AT A POINT TO BE MUTUALLY AGREED BETWEEN SELLERS/SUPPLIERS AND THE
BUYERS OR THEIR RESPECTIVE AGENTS, CLOSEST TO OR AT (WHERE POSSIBLE) THE VESSEL'S BUNKER MANIFOLD.

THE SAMPLES SHALL   BE DRAWN USING A MUTUALLY ACCEPTED SAMPLING DEVICE WHICH SHALL BE
CONSTRUCTED, SECURED AND SEALED IN SUCH A WAY SO AS TO PREVENT THE SAMPLING DEVICE AND THE
SAMPLES BEING TAMPERED WITH THROUGHOUT THE TRANSFER PERIOD.

THE AFOREMENTIONED SAMPLES SHALL BE SECURELY SEALED AND PROVIDED WITH LABELS SHOWING THE
VESSEL'S NAME , IDENTITY OF DELIVERY FACILITY, PRODUCT NAME, DELIVERY DATE AND PLACE AND SUPPLIERS
SEAL NUMBER.

HOWEVER, SAMPLE BOTTLES MUST BE FITTED WITH TWO SEAL LUGS TO ENABLE BUYERS REPRESENTATIVES TO
COUNTERSEAL THE SAMPLES. IN CASE SUPPLIERS CAN NOT PROVIDE SUCH SAMPLE BOTTLES, BUYERS SHALL HAND
OVER SAID BOTTLES TO THE SUPPLIER FREE OF CHARGE UNTIL FURTHER NOTICE.

SUCH SAMPLES SHALL BE DISTRIBUTED AS FOLLOWS:
TWO (2) SAMPLES TO BARGE SUPPLIER, TWO SAMPLES TO ATTENDING SURVEYOR, ONE (1) SAMPLE TO SEAGOING
VESSEL, ONE(1) SAMPLE TO MARPOL.

IT MUST BE NOTED THAT SAMPLES DRAWN EX INSTALLATION OR BEYOND BUYERS CONTROL, AND/OR WITHOUT AN
INDEPENDENT SURVEY OR AGREED BETWEEN THE SELLERS AND BUYERS BEING PRESENT ARE NOT
REPRESENTATIVE OF THE DESCRIPTION, QUANTITY, QUALITY OR FITNESS FOR PURPOSE OF THE "FUEL", FOR THE
AVOIDANCE OF DOUBT.   SIGNATURES FOR, OR ACCEPTANCE OF THE SAMPLE(S) BY THE VESSEL'S MASTER OR
ANOTHER  VESSEL'S REPRESENTATIVE OR AGENT IN RELATION TO SUCH SAMPLES SHALL NOT MEAN THAT THE
SAMPLES ARE REPRESENTATIVE OF THE "FUEL" SUPPLIED.
BARGE / SUPPLIERS SAMPLES TO BE RETAINED FOR NINETY ( 90 ) DAYS.

**11. PRICE**

THE PRICE OF "FUEL" DELIVERED SHALL BE AS AGREED AND STATED IN THE BUYERS' PURCHASE ORDER.
ANY DEMURRAGE CHARGES DUE TO BUYERS FAILURE SHALL BE ABSORBED BY THE BUYERS.
ANY DEMURRAGE CHARGES DUE TO SELLER / SUPPLIERS FAILURE SHALL BE ABSORBED BY THE SELLERS /
SUPPLIERS.

**12. PAYMENT**

UNLESS EXPLICITLY AGREED UPON IN WRITING BETWEEN SELLERS AND BUYERS PAYMENT IN US DOLLARS FOR THE
"FUEL" DELIVERED WILL BE AVAILABLE TO THE SELLER'S ACCOUNT WITHIN THIRTY CALENDAR (30)  DAYS AFTER
THE COMPLETION OF DELIVERY OR FIFTEEN ( 15)  RUNNING CALENDAR DAYS AFTER THE RECEIPT OF THE SELLERS'
INVOICE, WHICHEVER IS THE LATER.

ANY DELAY IN PAYMENT SHALL ENTITLE THE SELLERS TO INTEREST AT THE RATE OF 12% PER ANNUM.
SELLERS SHALL INFORM BUYERS OF ANY OUTSTANDING PAYMENT WITHIN 3 WORKING DAYS AFTER DUE DATE OF
INVOICE

SELLERS SHALL INFORM BUYERS OF ANY OUTSTANDING PAYMENT WITHIN 3 WORKING DAYS AFTER DUE DATE OF
INVOICE.

THE INVOICE HAS TO INCLUDE THE NAME OF THE RECEIVING VESSEL, THE BUNKERING PORT, THE DATE OF
DELIVERY, THE REFERENCE OF THE BUYERS, APART FROM DESCRIPTION OF THE QUANTITY AND QUALITY SUPPLIED.

**13. CLAIMS**

ANY DISPUTE AS TO THE QUANTITY DELIVERED MUST BE NOTED AT THE TIME OF DELIVERY IN THE BUNKER
DELIVERY RECEIPT OR IN THE LETTER OF PROTEST. ANY CLAIM AS TO SHORT DELIVERY SHALL BE PRESENTED BY

7 11.2019 00 15523934



THE BUYERS IN WRITING WITHIN 15 CALENDAR DAYS FROM THE DATE OF DELIVERY, FAILING WHICH ANY SUCH CLAIM SHALL BE DEEMED TO BE WAIVED AND ABSOLUTELY BARRED.

ANY CLAIM AS TO THE QUALITY OR DESCRIPTION OF THE "FUEL" MUST BE NOTIFIED IN WRITING PROMPTLY AFTER THE CIRCUMSTANCES GIVING RISE TO SUCH CLAIM HAVE BEEN DISCOVERED, IF THE BUYERS DO NOT NOTIFY THE SELLERS OF SUCH CLAIM WITHIN :
60 CALENDAR DAYS OF THE DATE OF DELIVERY FOR TERM CONTRACTED LOW SULPHUR FUEL OIL SUPPLIES IN ANTWERP OR ROTTERDAM.
30 CALENDAR DAYS OF THE DATE OF DELIVERY FOR SUPPLIES IN ALL REMAINING PORTS WORLD WIDE,
THEN THOSE CIRCUMSTANCES SHALL BE PRESUMED NOT TO HAVE BEEN CAUSED BY ANY DEFICIENCY IN THE QUALITY OR DESCRIPTION OF THE "FUEL" SUPPLIED AND ANY SUCH CLAIM SHALL BE DEEMED TO BE WAIVED AND ABSOLUTELY BARRED.

IN THE EVENT OF A CLAIM AS TO QUALITY AND DESCRIPTION THE PARTIES HERETO SHALL HAVE THE QUALITY OF THE "FUEL" ANALYSED BY A MUTUALLY AGREED, QUALIFIED AND INDEPENDENT LABORATORY. THE SELLERS AND THE BUYERS SHALL PROVIDE THE LABORATORY WITH ONE OF THE SAMPLES RETAINED , IF ISO GRADES HAVE BEEN SPECIFIED THE ANALYSIS SHALL BE ESTABLISHED BY TESTS IN ACCORDANCE WITH ISO 8217; LATEST EDITION 16 AND ISO 4259 OR ANY SUBSEQUENT AMENDMENTS THEREOF, UNLESS OTHERWISE AGREED THE EXPENSES OF THE ANALYSIS SHALL BE BORNE EQUALLY BY THE SELLERS AND THE BUYERS.

IN THE EVENT OF ANY DELAY RESULTING FROM:
THE BUYERS FAILURE TO GIVE PROPER NOTICES AND/OR THE BUYERS VESSEL FAILING TO RECEIVE "FUEL" AT THE PUMPING RATE

* THE SELLERS FAILURE TO COMMENCE DELIVERY OF THE "FUEL" PROMPTLY IN ACCORDANCE WITH THE BUYERS REQUIRED DELIVERY TIME   AND/OR THE SELLERS FAILURE TO DELIVER THE "FUEL" IN  ACCORDANCE WITH THE MINIMUM HOURLY PUMPING RATE , THEN THE PARTY SUFFERING SUCH A DELAY SHALL BE ENTITLED TO COMPENSATION FROM THE OTHER PARTY FOR THAT DELAY.

14. RISK/TITLE

RISK IN THE MARINE FUEL SHALL PASS TO THE BUYERS ONCE THE "FUEL" HAS PASSED THE FLANGE CONNECTING THE VESSEL'S BUNKER MANIFOLD WITH THE DELIVERY FACILITIES PROVIDED BY THE SELLERS.
TITLE TO THE MARINE FUELS SHALL PASS TO THE BUYERS UPON PAYMENT FOR THE VALUE OF THE MARINE FUELS DELIVERED, UNTIL SUCH PAYMENT HAS BEEN MADE, THE SELLERS SHALL HAVE THE RIGHT OF LIEN OVER THE MARINE FUELS DELIVERED.

15. CANCELLATION

IF THE VESSEL FAILS TO ARRIVE AT THE PLACE OF DELIVERY WITHIN 72 HOURS FROM THE DATE NOMINATED/ESTIMATED TIME OF ARRIVAL AS STATED IN THE BUYERS' PURCHASE ORDER, EITHER PARTY HAS THE OPTION TO CANCEL THE DELIVERY OF "FUEL" IMMEDIATELY WITHOUT INCURRING ANY LIABILITY WHATSOEVER.

16. FORCE MAJEURE

NEITHER PARTY SHALL BE RESPONSIBLE FOR ANY LOSS, DAMAGE, DELAY OR FAILURE IN PERFORMANCE UNDER THESE TERMS RESULTING FROM THE ACT OF GOD, OR THE PORT OF DELIVERY BEING AFFECTED BY STORMS, FLOODS, WAR, CIVIL COMMOTION, RIOT, FIRE, SABOTAGE, QUARANTINE, STRIKES, STOPPAGES, LOCK-OUTS, ARRESTS, DETAINMENTS OF KINGS, PRINCES, RULERS AND PEOPLE, ACTS OF TERRORISM OR ANY OTHER EVENT BEYOND THEIR CONTROL  ARISING AFTER AGREEING THESE TERMS WHICH CANNOT BE AVOIDED OR GUARDED AGAINST BY THE EXERCISE OF DUE DILIGENCE, OR THE CONSEQUENCES OF WHICH, AS MAY AFFECT THE PERFORMANCE OF THESE TERMS  CANNOT BE AVOIDED OR GUARDED AGAINST BY THE EXERCISE OF DUE DILIGENCE.

17. SAFETY AND THE ENVIRONMENT

IN THE EVENT OF ANY SPILLAGE, WHICH SHALL MEAN ANY LEAKAGE, ESCAPE, SPILLAGE OR OVERFLOW OF THE "FUEL", CAUSING OR LIKELY TO CAUSE POLLUTION OCCURRING AT ANY STAGE OF THE BUNKERING OPERATION, THE BUYERS AND THE SELLERS SHALL JOINTLY, AND REGARDLESS AS TO WHETHER THE BUYERS OR THE SELLERS ARE RESPONSIBLE , IMMEDIATELY TAKE SUCH ACTIONS AS ARE NECESSARY TO EFFECT CLEAN UP AND WHICH SHALL ALWAYS BE CONDUCTED IN ACCORDANCE WITH SUCH LOCAL LAWS AND REGULATIONS WHICH MAY COMPULSORILY APPLY.

WHERE IT IS A COMPULSORY REQUIREMENT OF THE LAW OF THE PORT OR PLACE OF DELIVERY OF THE "FUEL" THAT THE SELLERS SHALL HAVE IN PLACE THEIR OWN OIL SPILL CONTINGENCY PLANS, THE SELLERS SHALL  ENSURE

7.11.3949.00 15029954



THAT VALID OIL SPILL CONTINGENCY PLANS APPROVED BY THE RELEVANT AUTHORITIES ARE IN EFFECT TO THE EXTENT THAT IS SO REQUIRED.

THE SELLERS HEREBY GUARANTEE PAYMENT OF AND/OR AGREE TO INDEMNIFY AND HOLD THE BUYERS HARMLESS FOR ANY CLAIMS, LOSSES, DAMAGES, EXPENSES, PENALTIES OR OTHER LIABILITIES INCURRED BY THE BUYERS UNDER THE UNITED STATES OIL POLLUTION ACT OF 1990, OR OTHER POLLUTION LEGISLATION OF ANY STATE OF THE UNITED STATES OF AMERICA OR ANY OTHER COUNTRY OR JURISDICTION, AS A RESULT OF ANY SPILLAGE OCCURRING WHILST THE "FUEL" IS BEING TRANSPORTED DIRECTLY TO OR FROM THE BUYERS VESSEL'S MANIFOLD SAVE TO THE EXTENT THAT SUCH SPILLAGE IS CAUSED BY ANY FAULT ON THE PART OF THE BUYERS.
THE BUYERS SHALL SIMILARLY INDEMNIFY THE SELLERS WHERE ANY OF SUCH SPILLAGE OCCURS ONCE RISK IN THE "FUEL" HAS PASSED THE BUYERS VESSEL'S MANIFOLD SAVE TO THE EXTENT THAT SUCH SPILLAGE IS CAUSED BY ANY FAULT ON THE PART OF THE SELLERS.

THE SELLERS SHALL ENSURE THAT THE BARGE COMPANY IS INSURED FOR OIL SPILLAGE DAMAGES UP TO A MINIMUM AMOUNT PER INCIDENT REQUIRED BY THE APPLICABLE LOCAL STATUTORY RULES OR REGULATIONS, IF SUCH COVERAGE OR INSURANCE IS NOT OBTAINED BY THE BARGE COMPANY IT SHALL BE THE SOLE RESPONSIBILITY OF THE SELLERS TO ESTABLISH SUCH COVERAGE FOR THEIR ACCOUNT.
PROOF AND CONDITIONS OF SUCH COVERAGE, WHETHER ESTABLISHED BY THE BARGE COMPANY OR BY THE SELLERS SHALL BE MADE AVAILABLE TO THE BUYERS AT THEIR REQUEST, AS SOON AS PRACTICALLY POSSIBLE AND BEFORE THE DELIVERY OF THE "FUEL".

18. LAW AND ARBITRATION

THE ARBITRATION SHALL BE CONDUCTED IN ACCORDANCE WITH THE LONDON MARITIME ARBITRATION ASSOCIATION [ LMAA ] RULES IN FORCE AT THE TIME THAT THE ARBITRATION PROCEEDINGS ARE COMMENCED.
THIS CONTRACT SHALL BE COVERED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW AND ANY DISPUTE ARISING OUT OF THIS CONTRACT SHALL BE REFERRED TO ARBITRATION IN LONDON IN ACCORDANCE WITH THE ARBITRATION ACT 1996 OR ANY STATUTORY MODIFICATION OR RE - ENACTMENT THEREOF FOR THE TIME BEING IN FORCE. UNLESS THE PARTIES AGREE UPON A SOLE ARBITRATOR, ONE ARBITRATOR SHALL BE APPOINTED BY EACH PARTY AND THE ARBITRATORS SO APPOINTED SHALL APPOINT A THIRD ARBITRATOR, THE DECISION OF THE THREE-MAN TRIBUNAL THUS CONSTITUTED OR ANY TWO OF THEM, SHALL BE FINAL. ON THE RECEIPT BY ONE PARTY OF THE NOMINATION IN WRITING OF THE OTHER PARTY'S ARBITRATOR, THAT PARTY SHALL APPOINT THEIR ARBITRATOR WITHIN FOURTEEN DAYS, FAILING WHICH THE DECISION OF THE SINGLE ARBITRATOR APPOINTED SHALL BE FINAL.
GERMAN LAW SHALL APPLY ON THE "FUEL" CONTRACT WHENEVER THE SELLERS HAVE THEIR PLACE OF BUSINESS IN GERMANY.
IN THIS CASE ALL DISPUTES ARISING OUT OF OR IN CONNECTION WITH THIS CONTRACT OR CONCERNING IT'S VALIDITY SHALL BE FINALLY SETTLED BY ARBITRATION IN HAMBURG IN ACCORDANCE WITH THE ARBITRATION RULES OF THE GERMAN MARITIME ARBITRATION ASSOCIATION (GMAA).

HAPAG-LLOYD AG

HAMBURG                                                                                                    JULY 2014

O.W. BUNKER GERMANY GMBH
Herrengraben 11
20459 Hamburg
Phone +49 40 32 68 90 0 · Fax +49 40 33 04 71
e-mail: hamburg@owbunker.de

7.11.3640.00 16023404

# OW BUNKER GROUP

## Terms and Conditions of sale for Marine Bunkers
## Edition 2013

**A.**       **GENERAL INTRODUCTION**

A.1       This is a statement of the terms and conditions according to which the
          International O.W. Bunker Group (hereinafter called "OWB") will sell marine bunkers.

A.2       Those conditions apply to all offers, quotations, orders, agreements, services and all subsequent
          contracts of whatever nature, except where otherwise is expressly agreed in writing by OWB.

A.3       General trading conditions of another party will not apply, unless expressly accepted in writing by OWB.

A.4       In the case that, for whatever reason, one or more of the (sub)clauses of these general conditions are
          invalid, the other (sub)clauses hereof shall remain valid and be binding upon the parties.

**B.**       **DEFINITIONS**

B.1       Throughout this document the following definitions shall apply:

| | |
|---|---|
| "Seller" | means OWB; any office, branch office, affiliate or associate of the OWB Group; being the legal entity within the OWB Group, whose name is included in the Order Confirmation, sent to the Buyer. |
| "Buyer" | means the vessel supplied and jointly and severally her Master, Owners, Managers/Operators, Disponent Owners, Time Charterers, Bareboat Charterers and Charterers or any party requesting offers or quotations for or ordering Bunkers and/or Services and any party on whose behalf the said offers, quotations, orders and subsequent agreements or contracts have been made; |
| "Bunkers" | means the commercial grades of bunker oils as generally offered to the Seller's customers for similar use at the time and place of delivery and/or services connected thereto; |
| "Owner" | means the registered Owner, Manager or Bareboat Charterer of the vessel; |
| "Vessel" | means the Buyer's Vessel, Ship, Barge or Off-Shore Unit that receives the supply/bunkers; either as end-user or as transfer unit to a third party; |
| "Nomination" | means the written request/requirement by the Buyer to the Seller, for the supply of the Bunkers; |
| "Order Confirmation" | means the written confirmation as issued by the Seller and forwarded to the Buyer to conclude the conclusion of the negotiated sale/purchase of the Bunkers. In case of conflict between the Nomination and the Order Confirmation, unless the Seller otherwise agrees in writing, the wording and content of the Order Confirmation is deemed contain the prevailing terms of the Agreement; |
| "Agreement" | means the concluded terms for the sale/purchase of the Bunkers; |
| "Supplier" | means any party instructed by or on behalf of the Seller to supply or deliver the Bunkers; |
| "GTC" | means these General Terms and Conditions which shall govern the contractual regulations between the Seller and the Buyer |
| "BDR" | means the Bunker Delivery Receipt, being the document(s) which is/are signed by the Buyer's representative(s) at the place of the supply of the Bunkers to the Vessel, evidencing the quality and quantity of the Bunkers supplied to and received by the Vessel. |

**C.**       **OFFERS, QUOTATIONS AND PRICES.**

C.1       An Agreement shall only be concluded and binding on the Seller when the Seller sends the Order
          Confirmation to the Buyer. Each Order Confirmation shall incorporate these GTC by reference so that the
          GTC are considered a part of the Confirmation.

C.2       Agreements entered into via brokers, or any other authorised representative on behalf of the Seller, shall
          only bind the Seller upon the Sellers' broker or other authorised representative sending the Order
          Confirmation to the Buyer or the Buyer's broker as the case may be.

C.3       The Seller's offer is based on the applicable taxes, duties, costs, charges and price level of components
          for Bunkers existing at the time of the conclusion of the Agreement. Any later or additional tax,
          assessment, duty or other charge of whatever nature and however named, or any increase of
          components for Bunkers or any additional costs borne by the Seller whatsoever caused by any change
          in the Seller's contemplated source of supply or otherwise, coming into existence after the Agreement
          has been concluded, shall be added to the agreed purchase price, provided that the Seller shall give

the Buyer prior notice of this effect within a reasonable (under the prevailing circumstances) time after the Seller becoming aware of the relevant circumstances.

C.4    All prices and/or tariffs are exclusive VAT, unless specifically stated otherwise. Any VAT or other charge and/or tax applicable and whenever imposed, shall be promptly paid by the Buyer, and unless otherwise agreed in writing all supplies are quoted and invoiced based on quantity calculated quantity in metric tons in vacuum.

C.5    If the party requesting Bunkers is not the Owner of the Vessel, the Seller shall have the right (but will not be obliged) to insist as a precondition of sale that a payment guarantee is provided by the Owner. The Seller shall have the right (but will not be obliged) to cancel any agreement with the Buyer at any time, if such payment guarantee is not received upon request thereof from the Seller to the Owner. The Seller's decision to forego obtaining a payment guarantee under this Clause C.5 shall have no effect on Seller's right to a lien on the Vessel for any Bunkers supplied under this Agreement.

C.6    The Buyer warrants that it is authorized as agent to order Bunkers for the Vessel, and that the Seller has a lien on the Vessel for any Bunkers supplied under this Agreement. If the party requesting Bunkers is not the Owner of the Vessel, Buyer assumes the sole responsibility for communicating the terms and conditions of this Agreement to the Owner of the Vessel prior to the date of delivery.

C.7    If at any time before the delivery the financial standing of the Buyer appears to the Seller (in its absolute discretion) to have become impaired or unsatisfactory, the Seller may require cash payment or security to be provided by the Buyer prior to delivery, failing which the Seller may cancel the delivery without any liability on the part of the latter or its subcontractors.

D.    SPECIFICATIONS (QUALITY – QUANTITY)

D.1    The Buyer assumes the sole responsibility for the choice of nominating the quantity and quality of Bunkers and determine (if applicable) potential compatibility with any Bunkers already on board the Vessel. The Buyer also assumes sole responsibility for the selection and fitness of its choice of Bunkers for any particular use or purpose, and the Seller shall assume no responsibility whatsoever for the compliance or fitness of the Bunkers for a specific type of engine or equipment which the Buyer may or may not have agreed upon in any C/P (Charterparty) term or otherwise. This includes but is not limited to the quality, sulphur content and any other specific characteristics of the Bunkers whatsoever. Any and all warranties regarding the satisfactory quality, merchantability, fitness for purpose, description or otherwise, are hereby excluded and disclaimed.
Where specifications designate a maximum value, no minimum value is guaranteed unless expressly stated in the Order Confirmation, and conversely where minimum values are provided in a specification, no maximum values are guaranteed unless expressly stated in the Order Confirmation.

D.2    The quality and quantity shall be as agreed between the Seller and the Buyer and shall correspond to the Seller's Order Confirmation. Unless otherwise agreed in writing the Bunkers are delivered and sold based on metric tons in vacuum.

D.3    Where standard specifications are being given or referred to, tolerances in accordance with ISO 4259 in respect of Reproducibility/Repeatability in quality are to be accepted without compensation or other consequences whatsoever.

D.4    In respect of the quantity agreed upon the Seller shall be at liberty to provide, and the Buyer shall accept a variation of 5% from the agreed quantity, with no other consequence than a similar variation to the corresponding invoice from the Seller.

D.5    Information regarding the typical characteristics of the Bunkers at any delivery location shall only be indicative of the Bunkers that have been made available at that location and shall not form a part of the specification of the Bunkers to be delivered. All grades of produce may contain petroleum industry allowed bio-derived components.

E.    MEASUREMENTS – NON CLAUSING OF THE BDR(S)

E.1    The quantities of bunkers shall be determined only from the official gauge or meter of the bunkering barge, tank truck or of the shore tank in case of delivery ex wharf.

E.2    The Buyer's representative shall together with the Seller's representative measure and verify the quantities of Bunkers delivered from the tank(s) from which the delivery is made. When supplied by bunkering barge/tanker the particular barge/tanker will present its tank calibration and ullage sounding records, which are agreed to be the sole valid and binding document(s) to determine the quantity or quantities supplied. Quantities calculated from the Receiving Vessel's soundings shall not be considered.

E.3     Should the Buyer's representative fail or decline to verify the quantities, the measurements of quantities made by the Seller or the Supplier shall be final, conclusive and binding and the Buyer shall be deemed to have waived any and all claims in regard to any variance.

E.4     The Buyer expressly undertakes not to make any endorsement, complaint/ comment (including but without limitation any "No-lion" clausing) on the BDR when presented for signature by the Buyer's representative(s), any such insertion shall be invalid and of no effect whatsoever.

E.5     In the event of complaint/comment on the quantity of Bunkers delivered, the Buyer or the Master of the Vessel shall give to the Seller/Supplier a letter of protest separately, followed by a complaint in detail to the Seller, setting out the exact quantity(ies) claimed shortsupplied, and with full supporting vouchers, in writing within 7 (seven) days thereof, failing which, any such claim by the Buyer shall be extinguished as non existent, and the Buyer shall be deemed to have expressly waived any such claim against the Seller/Supplier, the relevant claim being time barred, and the Seller/Supplier's weight and measurements shall be conclusive evidence of the quantity of Bunkers delivered.

F.      SAMPLING

F.1     The Supplier shall arrange for four (4) representative samples of each grade of Bunkers to be drawn throughout the entire bunkering operation. The Buyer's representative has the responsibility to witness that such samples are drawn correctly and shall confirm his witnessing thereof and also confirm the proper and correct sealing by signing the labels of the sample bottles.

F.2     In case that dripsampling is not available onboard the barge, tanktruck or shore tank, samples shall be taken as a composite of each tank from which supplies are made, onboard the barge (respectively at the shore tank or tanktruck), divided with 1/3 from each the top, mid and bottom of the tanks.

F.3     The samples shall be securely sealed and provided with labels showing the Vessel's name, identity of delivery facility, product name, delivery date and place and seal number, authenticated with the Vessel's stamp and signed by the Seller's representative and the Master of the Vessel or his representative. The seal numbers shall be inserted into the BDR/Bunker Delivery Receipts, and by signing the BDR both parties agrees to the fact that the samples referred to therein are deemed valid and taken in accordance with the requirements as specified in this Chapter F.

F.4     Two (2) samples shall be retained by the Seller for ninety (90) days after delivery of the Bunkers, or if requested by the Buyer in writing, for as long as the Buyer reasonably required. The other two (2) samples shall be retained by the receiving Vessel, one of which being dedicated as the MARPOL sample.

F.5     In the event of a dispute in regard to the quality of the Bunkers delivered, the samples drawn pursuant to this Chapter F, shall be conclusive and final evidence of the quality of the Bunkers delivered. One, and only one, of the samples retained by the Sellers shall be forwarded to an independent laboratory to perform a set of tests, the result of which is to be made available to both parties. Those test results shall be final and binding upon both Buyer and Seller as to the parameters tested. The parties are to use best endeavours to agree the independent laboratory to perform the tests, if, however, no agreement can be reached on the choice of laboratory within 3 days of the Buyer being advised of the Seller opting to have the sample tested, the Seller is at liberty to send the sample to a reputable and independent laboratory of its choice for the tests to be conducted, and those test result will be final and binding upon Buyer and Seller as set out above.

F.6     The seal must be breached only in presence of both parties unless one/both in writing have declared that they will not be present, or fails to be present at the appropriate time and place; and both parties shall have the right to appoint independent person(s) or surveyor(s) to witness the seal breaking.

F.7     No samples subsequently taken shall be allowed as (additional) evidence. If any of the seals have been removed or tampered with by an unauthorised person, such sample(s) shall be deemed to have no value as evidence.

F.8     Any eventual samples drawn by Buyer's personnel either during bunkering or at any later date after bunkering shall not be valid as indicator of the quality supplied. The fact that such samples may eventually bear the signature of personnel on board the barge or tank truck or other delivery conveyance shall have no legal significance as such local personnel have no authority to bind Seller to different contractual terms. Seller shall have no liability for claims arising in circumstances where Buyer may have commingled the products on board the Vessel with other fuels.

**G.        DELIVERY**

G.1        The time of delivery, as given by the Seller, has been given as an approximate time, unless it has been
           otherwise specifically agreed in writing between the parties.

G.2        The time of delivery will only be binding upon the Seller when all information necessary for the Seller to
           comply with its obligations hereunder, have been properly delivered to the Seller in reasonable time
           before the delivery. In the event the Nomination addresses a spread of dates for delivery, the Seller has
           the sole discretion to commence the delivery within any time, day/night/sshinc of these dates, always
           subject to the circumstances set out below in Clause G.3.

G.3        The Vessel shall under all circumstances be bunkered as promptly as the prevailing circumstances permit,
           having regard to congestion affecting the delivery facilities of Seller, its Suppliers or Agents and to prior
           commitments of barges or other delivery means. The Seller and/or the Supplier shall not be liable for any
           consequences or any time lost due to the Vessel having to wait for berth for bunkering or for completion
           of bunkering, and unless otherwise agreed in writing, the Seller shall not be obligated to deliver prior to
           the nominated date or spread of dates. The Seller is not responsible for delays caused by local customs,
           pilots, port- or other authorities.

G.4        In any case the Buyer, unless otherwise agreed in writing, must give not less than 72 (seventy two) hours
           approximate notice of readiness of the Vessel for delivery, which is to be followed by 48 (forty eight)
           hours and 24 (twenty four) hours such notices, where the last notice must also specify the exact place of
           delivery. All these notices must be given to the Sellers and the Seller's representatives/agents in writing.

G.5        The Seller shall be entitled to deliver the Bunkers by separate part deliveries, in which case each part
           delivery shall be construed as a separate delivery.

G.6        The Seller shall not be required to deliver any Bunkers if any customs and/or other government permit
           required for such purpose has not been obtained in due time before the delivery.

G.7        If the Seller at any time for any reason believes that there may be a shortage of supply at any place and
           that as a result thereof it may be unable to meet the demands of all its customers, the Seller may
           allocate its available and anticipated quantity/ies of Bunkers among its customers in such a manner as it
           may determine appropriate in its sole discretion.

G.8        The Vessel shall be accessible at all times to Seller and Supplier and shall be bunkered as promptly as the
           circumstances permit. The Seller and/or the Supplier shall not be liable for any demurrage paid or
           incurred by the Buyer or for any loss, damage or delay of the Vessel (consequential and/or liquidating
           damages included) of any nature whatsoever due to congestion at the loading terminal, prior
           commitments of available barges or tank trucks or any other reason.

G.9        The Buyer shall ensure that the Vessel provides a free, safe and always afloat and accessible side for the
           delivery of bunkers and that all necessary assistance as required by the Seller or the Seller's
           representative is rendered in connection with the delivery. If in the Supplier's opinion clear and safe berth
           is unavailable, delivery might be delayed or, in Seller's option, cancelled and all costs related to above
           will be on account of the Buyer.

G.10       The Vessel shall moor, unmoor, hoist and lower bunkering hose(s) from the barge(s) whenever required
           by the Seller, Seller's representative or Supplier, free of expenses and in any way as may be requested to
           assist the barge equipment to a smooth supply. The Buyer shall make and be responsible for all
           connections and disconnections between the delivery hose(s) and the Vessel's bunker intake
           manifold/pipe and ensure that the hose(s) are properly secured to the Vessel's manifold prior to
           commencement of delivery.
           During bunkering the Vessel's scuppers must be safely blocked, which blocking must be made by the
           Vessel's own crew. Furthermore the Vessel must ensure that all pipes and manifolds and receiving tanks
           are properly checked and ready to receive the bunkers, including but not limited to ensuring proper
           opening/closing of relevant valves, without any risk for spillages, etc, during the bunkering.
           Local further special requirements for receiving bunkers must be followed strictly by the Vessel, whether
           advised or not by the Seller or the Seller's representative, as it is always the Vessel and the Buyer who
           remains solely responsible for the knowledge and awareness of such eventual additional requirements
           for safety reasons.

G.11       In the event that the Vessel is not able to receive the delivery promptly, the Buyer is thereby in default
           and shall pay damages and/or any reasonable demurrage claim to the barging/supplying facilities and
           shall indemnify the Seller in each and every respect as a result thereof.

G.12       Delivery shall be deemed completed and all risk and liabilities, including loss, damage, deterioration,
           depreciation, contamination, evaporation or shrinkage to the Bunkers delivered and responsibility for
           loss, damage and harm caused by pollution or in any other manner to third parties shall pass to the Buyer

from the time the Bunkers reach the flange/connecting pipe line(s)/delivery hoses provided by the Seller on the barge/ tank truck/shore tank.

G.13     If the Buyer for whatever reason is unable or refuses to receive the full quantity ordered, the Seller shall have the right to invoice the Buyer for the loss incurred by having to transport the undelivered Bunkers back to the storage or by having to sell the Bunkers in a degraded form or at a lower price. The Seller may exercise this right without prejudice to the Seller's other rights for damages or otherwise pursuant to these conditions.

G.14     The Vessel shall provide and have appropriate and segregated tanks to receive the contracted quantity of Bunkers; and the Vessel shall always be able to perform its own blending on board if any blending is deemed to be required by the Buyer. The Vessel shall upon delivery test the Bunkers supplied by running her engines or auxiliaries or equipment, for which the Bunkers are supplied, for a minimum of 1 (one) hour to determine that the Bunkers are satisfactory. In the event the Bunkers are not considered satisfactory, the Seller and Supplier are to be notified in writing immediately after such test period has expired. Otherwise, it shall be deemed that the Bunkers were satisfactory and that in any event the Buyer has waived any right to claim in this regard.

G.15     If delivery is required outside normal business hours or on local weekends, Saturday, Sunday, national religious or public holidays the extra expenses incidental to such delivery shall be reimbursed by the Buyer as additional costs.

G.16     In the event the Bunker delivery is made by vessel or barge as a ship-to-ship transfer, any damage caused by contact and/or collision and/or swell and/or other weather or sea related condition or incident, is to be dealt with by the Owners directly with the owners of the units involved, and Seller/Supplier shall not be held nor be responsible for any such damages. If, however, any of the involved units choose to pursue Seller and/or Supplier, Buyer will fully indemnity and hold Seller harmless in relation thereto.

G.17     For safety reasons it is agreed that it is solely the Master of the bunkering barge that determines whether mooring alongside is safe, taking weather, swell and forecasts into consideration. Supplier/Seller not to be held responsible for any delays, demurrages, liquidating damages or similar whatsoever as a result of any eventual delays caused by any decision by the Master of the barge in this connection. Supplies being always performed weather permitting.

G.18     Without prejudice to any other article(s) herein, any and all supply/ies will be based on as per best endeavours only if the receiving Vessel arrives outside the originally agreed time split as per the Order Confirmation forwarded.

**H.**       **TITLE**

H.1     Title in and to the Bunkers delivered and/or property rights in and to such Bunkers shall remain vested in the Seller until full payment has been received by the Seller of all amounts due in connection with the respective delivery. The provisions in this section are without prejudice to such other rights as the Seller may have under the laws of the governing jurisdiction against the Buyer or the Vessel in the event of non-payment.

H.2     Until full payment of the full amount due to the Seller has been made and subject to Article G.14 hereof, the Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller, and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel nor mix, blend, sell, encumber, pledge, alienate, or surrender the Bunkers to any third party or other Vessel.

H.3     In case of non or short payment for the Bunkers by the Buyer, the Seller is entitled (but not obliged) to repossess the Bunkers without prior juridical intervention, without prejudice to all other rights or remedies available to the Seller.

H.4     In the event that the Bunkers have been mixed with other bunkers on board the Vessel, the Seller shall have the right to trace its proprietary interest in the Bunkers into the mixed bunkers and/or a right of lien to such part of the mixed bunkers as corresponds to the quantity or net value of the Bunkers delivered.

H.5     The provisions of this Chapter H do not prejudice or in any way limit the Seller's right to arrest/attach the Vessel and/or sister ship and/or any sister or associate ship and/or other assets of the Buyer (or the Owner of the Vessel or any other party liable), wherever situated in the world, without prior notice.

H.6     Where, notwithstanding these conditions, title in and to the Bunkers delivered has passed to the Buyer and/or any third party before full payment has been made to the Seller, the Buyer shall grant a pledge over such Bunkers to the Seller. The Buyer shall furthermore grant a pledge over any other Bunkers present in the respective Vessel, including any mixtures of the delivered Bunkers and other bunkers. Such pledge

will be deemed to have been given for any and all claims, of whatever origin and of whatever nature that the Seller may have against the Buyer.

H.7     For the avoidance of doubt, where a mortgagee bank enforces any rights against the Vessel and becomes a mortgagee in possession of the Bunkers then as bailee the mortgage bank is liable to the Seller for fulfilment of the Agreement.

I.      **PAYMENT – MARITIME LIEN**

I.1     Payment for the Bunkers and/or the relevant services and/or charges shall be made by the Buyer as directed by the Seller within the period agreed in writing.

I.2     Payment shall be made in full, without any set-off, counterclaim, deduction and/or discount free of bank charges to the bank account indicated by the Seller on the respective invoice(s).

I.3     (i) if at any time after delivery but before the due date the financial standing of the Buyer appears to the Seller (in its sole discretion) to have become impaired or unsatisfying, the Seller may require immediate full payment of all its invoices due and/or those not yet due, or such security as it shall deem to be satisfactory,
        (ii) in the event that the Buyer shall default in making any payment due, the Seller may suspend deliveries of Bunkers until such payment has been made in full (together with default/delay compensation and costs), or the Seller may, in its discretion, elect to treat such default as a serious breach of the Agreement and thereupon terminate the Agreement on whole or in part without prejudice to any claim against the Buyer for damages, including cancellation charges. Such termination or suspension shall not relieve the Buyer of any obligation undertaken by virtue of an Agreement so terminated.
        (iii) Where the Seller has extended any kind of credit facility to a group of companies or associated companies, default by any one relevant Buyer in respect to any invoice of the Seller shall give the right to the Seller to cancel all credit arrangements of the entire group or of all the associates, whereupon sub-clauses I.3.(i) and I.3.(ii) shall apply as appropriate.
        (iv) Where the Buyer fails to pay timely, the Seller has the right to (without prejudice to its rights to receive default/delay compensation) take all appropriate steps to secure and enforce its claim; the Seller may also unilaterally cancel any credit arrangements agreed with/extended to the Buyer.
        (v) All judicial and extrajudicial costs and expenses, including pre-action costs, fees, expenses and disbursements of the Seller's lawyers/attorneys-at-law, incurred in connection with non payment or delayed payment or by any other breach by the Buyer of these conditions, shall be for the Buyer's account, immediately payable by the latter to the Seller. In case of litigation, the Buyers shall also pay all the relevant expenses to the Seller, including but without limitation all his reasonable attorneys/lawyers' fees, costs and disbursements.

I.4     Payment shall be deemed to have been made on the date of which the Seller has received the full payment and such is available to the Seller. If payment falls due on a non-business day, the payment shall be made on or before the business day nearest to the due date. If the preceding and the succeeding business days are equally near to the due date, then payment shall be made on or before the preceding business day.

I.5     Any delay in payment of the full sum due shall entitle the Seller to interest at, the rate of 3 (three) per cent per month (compounded monthly for each month (or part thereof) of non payment) without prejudice to any rights or remedies available to the Seller. Furthermore the Seller is entitled to charge a delayed payment administration fee of USD 1.50 per mton supplied, or the equivalent thereof in local currency, with a minimum administration fee of USD 350.00 for each delivery made. All reasonable attorneys' fees incurred by Seller in connection with the collection of overdue payments shall be for the sole account of the Buyer.

I.6     Payments made by the Buyer in respect of a supply of Bunkers shall at all times be credited in the following order: (1) costs of any kind or nature, including but not limited to legal costs and attorneys' fees, (2) interest and administrational fee, and (3) invoices in their order of age, also if not yet due, or in Seller's sole discretion to specify a payment to any such invoice Seller considers relevant.

I.7     All costs borne by the Seller in connection with the collection of overdue payments, including those of the Seller's own legal and credit department and, including but not limited to, reasonable attorneys' fees, whether made in or out of court and in general all costs in connection with breach of any agreement by the Buyer, including but not limited to reasonable attorneys' fees, shall be for the sole account of the Buyer.

I.8     The Seller shall at all times, in its absolute discretion, be entitled to require the Buyer to provide the Seller what the Seller deems to be proper security for the performance of all of Buyer's obligations under the Agreement. Failing the immediate provision of such security upon Seller's demand, the Seller shall be

entitled to stop any further execution of any agreement(s) between the parties until such time as the Buyer has provided the required security.

I.9 Where Bunkers are supplied to a Vessel, in addition to any other security, the Agreement is entered into and the Goods are supplied upon the faith and credit of the Vessel. It is agreed and acknowledged that the sale of Bunkers to the Buyer and/or their acceptance on the Vessel create a maritime lien over the Vessel for the price of the Bunkers (and all interest and costs payable in respect thereof; including but not limited to the reasonable attorney's fees), such maritime lien afforded to the Seller over the Vessel. In any event any applicable Law shall not prejudice the right of the maritime lien of the Seller afforded hereunder or by any other applicable Law, be it of the place of delivery, or the flag of the Vessel, or the place at jurisdiction and/or an arrest of the Vessel, or otherwise howsoever.

I.10 It is mutually agreed that the Bunkers provided by the Seller to the Buyer under the terms of this Agreement have been ordered by the Buyer in the ordinary course of business between Seller and Buyer. All payments from Buyer to Seller for Bunkers supplied under this Agreement are deemed to have been made in the ordinary course of business between Seller and Buyer, according to these ordinary business terms agreed between them.

## J.   CLAIMS

J.1 In addition to the obligations referred to in Article E.4 and E.5 herein, any claim in connection with the quantity of the Bunkers delivered must be notified by the Buyer, or the Master of the Vessel, to the Seller or Supplier immediately after completion of delivery in the form of a letter of protest. If the Buyer or the Vessel's Master fails to present such immediate notice of protest to the Seller or Supplier, such claim shall be deemed to have been waived and shall be absolutely barred for all purposes.

J.2 Always without prejudice to Article G.14 herein, any and all claims concerning the quality of the Bunkers delivered or time consumed for the entire operation, shall be submitted to the Seller in writing within 15 (fifteen) days after delivery with a clear statement as to the nature of the claim(s) along with appropriate supporting documentation, failing which any rights to complain or claim compensation of whatever nature shall be deemed to have been waived and absolutely barred for all purposes.

J.3 The Buyer shall be obliged to make payment in full and fulfil all other obligations in accordance with the terms of the Agreement and these conditions, whether or not it has any claims or complaints. If Buyer submits a claim against Seller with respect to the quality or quantity of the products supplied, the Seller or the Seller's nominated representative shall be entitled to board the Vessel and investigate the Vessel's records, log books, engine logs, etc, and to make copies of any such document the Seller or the Seller's nominated representative may consider necessary for its investigations connected to the case. The Buyer shall allow this, or where Buyer has chartered the Vessel then the Buyer shall obtain authorization from Owner to allow the herein stated steps and to provide full assistance and to provide full cooperation by the Vessel's officers and crew in any such manner the Seller or Seller's nominated representative may require. Failure to allow boarding and/or produce required copies of documents and/or lack of full cooperation by the Vessel's officers and crew shall constitute a waiver of the Buyer's claim.

J.4 The Seller shall be allowed, and the Buyer, Owner, Officers and Crew onboard the receiving Vessel shall agree and in any way support and cooperate with Seller's representative, to draw samples from the Vessel's storage tanks, settling tanks and service tank and/or from before and after the Vessel's centrifuges to have extra tests carried out for such samples at independent laboratory.

J.5 In each and every case, any and all claims of the Buyer shall be timebarred unless arbitration/legal proceedings have been commenced/issued at the competent tribunal/court set forth in Chapter P hereof and served within 12 (twelve) months from the date of delivery of the Bunkers, or the date that delivery should have commenced pursuant to the Order Confirmation from the Seller.

## K.   LIABILITY – LIMIT TO SELLER'S LIABILITY

K.1 The Seller and/or Supplier shall not be liable for damages of whatever nature, including physical injury, nor for delay of delivery of Bunkers or services, no matter whether such damages or delay have been caused by fault or negligence on the side of the Seller. The Seller shall furthermore not be liable for damages or delay as described above when such damages or delay have been caused by the fault or negligence of its personnel, representatives, Supplier or (sub)contractors.

K.2 Liabilities of the Seller for consequential and/or liquidated damages including but not limited to loss of time, loss of cargo or charter cancelling date, loss of income or profit/earnings, are excluded. In any event and notwithstanding anything to the contrary herein, liability of the Seller shall under no

circumstances exceed the invoice value of the Bunkers supplied under the relevant agreement to the relevant Vessel.

K.3    The Buyer shall be liable towards the Seller and herewith undertakes to indemnify the Seller for any and all damages and/or costs suffered or otherwise incurred on the Seller due to a breach of contract and/or fault or neglect of the Buyers, its Supplier, agents, servants, (sub)contractors, representatives, employees and the officers, crews and/or other people whether or not on board of the Vessel(s). The Buyer furthermore undertakes to hold the Seller harmless in case of any third party institutes a claim of whatever kind against the Seller whether direct or indirect relation to any agreement regulated by these terms and conditions. Third party shall mean any other (physical or legal) person/company than the Buyer.

K.4    No servant, supplier or agent of the Seller/Supplier (including independent (sub)contractors from time to time employed by the Seller/Supplier) shall be liable to the Buyer for loss, damage or delay, while acting in the course of or in connection with its employment and/or agency for the Seller. Without prejudice to the above every exemption, limitation, condition and liberty herein contained, and every right, exemption from or limit to liability, defence or immunity of whatever nature applicable to the Seller or to which it is entitled hereunder shall also be available and shall extend to protect every such servant, representative or agent of the Seller and/or the Supplier acting as aforesaid.

L.     EXEMPTIONS AND FORCE MAJEURE

L.1    Neither the Seller nor the Seller's Supplier shall be liable for any loss, claim, damage, delay or demurrage due to any delay or failure in their performance under this Agreement (a) by reason of compliance with any order or request of any government authority, or person purporting to act therefore, or (b) when supply of the Bunkers or any facility of production, manufacture, storage, transportation, distribution or delivery contemplated by the Seller or Supplier is interrupted, delayed by congestion or other event (also see Article G.3 above), or by unavailability of product and/or barge equipment or by inadequate resource for any cause whatsoever which interruption, delay, unavailability or inadequate resources is not within the immediate control of the Seller or the Supplier, including (without limitation) if such is caused wholly or partly by labour disputes, strikes, stoppages, lock-out, governmental intervention, wars, civil commotion, riot, quarantine, fire flood, earthquake, accident, storm, swell, ice, adverse weather or any act of God. Neither the Seller nor the Supplier shall be required to remove any such cause or replace any affected source or supply or facility if doing so shall involve additional expense or a deviation from the Seller's or the Supplier's normal practices. Neither the Seller, nor the Supplier shall be required to make any deliveries which fall in whole or in part as a result of the causes set out in this Article at any later time.

L.2    If the Buyer exercises reasonable diligence, the Buyer shall not be liable for failure to receive any particular delivery if prevented therefrom by force majeure. The Buyer shall indemnify the Seller or the Seller's supplier for any damage caused by the Buyer, the Buyer's agent or employees in connection with deliveries hereunder.

L.3    Declaration of Force Majeure shall be given without unduly delay once such event(s) have come to the knowledge of the respective party declaring same. However, under no circumstances and for no reason whatsoever, can Force Majeure entitle the Buyer not to pay promptly any invoice of the Seller.

L.3    In the event that the Seller, as a result of force majeure, can only deliver a superior grade of bunkers, the Seller is entitled to offer the said grade, and the Buyer must accept delivery thereof and pay the applicable price.

L.4    (a)    These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions. In such circumstances, these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party.

       (b)    Without prejudice or limitation to the generality of the foregoing, in the event that the third party terms include:

       (i)    A shorter time limit for the doing of any act, or the making of any claim, then such shorter time limit shall be incorporated into these terms and conditions.

       (ii)   Any additional exclusion of liability clause, then same shall be incorporated mutatis mutandis into these.

       (iii)  A different law and/or forum selection for disputes to be determined, then such law selection and/or forum shall be incorporated into these terms and conditions.

(c)   It is acknowledged and agreed that the buyer shall not have any rights against the Seller which are greater or more extensive than the rights of the supplier against the aforesaid Third Party.

M.        BREACH/CANCELLATION

M.1       Without prejudice to any other remedies and rights, the Seller shall have the option immediately to cancel the Agreement in full or in part, or to store or procure the storage of the Bunkers, in whole or in part, for the account and risk of the Buyer and to charge the Buyer the expenses thereby incurred, or to hold the Buyer fully to the agreement, or take any other measures which the Seller deems appropriate, without prejudice to its rights of indemnification, without any liability on the side of the Seller, in any one of (but not limited to) the following cases:

a)     when the Buyer, for whatever reason, fails to accept the Bunkers in part or in full at the place and time designated for delivery;

b)     when the Buyer fails in part or in full to comply with its obligations to pay any amount due to the Seller and/or provide security as set out in these GTC;

c)     when, before the date of delivery, it is apparent in the opinion of the Seller that the financial position of the Buyer entails a risk to the Seller;

d)     when, in case of force majeure, the Seller is of the opinion that the execution of the agreement should be cancelled.

M.2       The Seller may terminate any Agreement with the Buyer in whole or in part, in its full discretion, upon the breach of any provisions hereof by the Buyer or in the event that the Buyer fails to make or suspends payment, ceases to carry on business, makes an arrangement with its creditors or undergoes any form of bankruptcy, administration, re-organisation or asset rearrangement.

M.3       The Seller has the option to immediately cancel the Agreement for the account and risk of the Buyer if at any time the Seller, in its sole discretion, has reasonable grounds to believe that:

a)     The Vessel; or
b)     The Charterer of the Vessel; or
c)     The fully or partly Owner(s) of the Vessel; or
d)     Any officers of the Vessel; or
e)     The Operator and/or Manager of the Vessel; or
f)     Any other person or entity in any way related to the Agreement or delivery is/are

1)     Iranian(s); or
2)     Related in any way to Iran or Iranians; or
3)     Listed on the US OFAC Specially Designated Nationals List; or
4)     Covered by any US, UN- and/or EU sanctions; or
5)     Covered by any sanctions of any other jurisdiction and/or administration.

Under no circumstances can the Seller be held liable for any loss, delays, claims or damages of whatever kind suffered by the Buyer due to a cancellation under this Article.

The Buyer must inform the Seller immediately the Buyer becomes aware of or has reasons to believe that any of the above items a) to f) in combination with any of the above items 1) to 5) are fulfilled/apply. Should the Buyer breach its obligation to inform the Seller, the Buyer shall fully indemnify and keep the Seller harmless for any damage or loss caused by such breach, including consequential or liquidated damages.

M.4       The Buyer acknowledges that any agreements with the Seller and any actions related to such agreements as well as any interaction with third parties related to such agreements are covered by certain anticorruption laws and regulations which can include any anticorruption law, including but not limited to the U.S. Foreign Corrupt Practices Act ("FCPA"), and the UK Bribery Act. Therefore, the Buyer declare to comply with all applicable anticorruption laws and regulations and agrees that the Buyer has not, and will not, offer, promise, pay, or authorize the payment of any money or anything of value, or take any action in furtherance of such a payment, whether by direct or indirect means, to any public official or private individual to influence the decision of such person in the performance of his duties to a government or to his company. Any breach of this clause will void the related Agreement and in the sole discretion of the Buyer any other Agreement between the parties, making any claims for payment, delivery or any other obligation of the Seller under this Agreement void. The Buyer is liable for all and any costs or losses incurred by the Seller due to such breach and/or an Agreement becoming void as a consequence.

N.        SPILLAGE, ENVIRONMENTAL PROTECTION

N.1       If a spill occurs while the Bunkers are being delivered, the Buyer shall promptly take such action as is necessary to remove the spilled Bunkers and mitigate the effects of such spill. Without prejudice to the

generally of the foregoing the Seller is hereby authorised by the Buyer in the absolute discretion of the Seller, but at the expense of the Buyer, to take such measures and incur such expenses (whether by employing its own resources or by contraction with others) as are necessary in the judgment of the Seller to remove the spilled Bunkers and mitigate the effects of such spill. The Buyer shall cooperate and render such assistance as is required by the Seller in the course of the action. All expenses, claims, costs, losses, damages, liability and penalties arising from spills shall be borne by the party that caused the spill by a negligent act or omission. If both parties have acted negligently, all expenses, claims, losses, damages, liability and penalties, shall be divided between the parties in accordance with the respective degree of negligence. The burden of proof to show the Seller's negligence shall be on the Buyer. The Buyer shall give the Seller all documents and other information concerning any spill or any programme for the prevention thereof that is required by the Seller, or is required by law or regulation applicable at the time and place of delivery.

**O,**     **DELAYS AND CANCELLATIONS**

O.1      Notwithstanding anything else to the contrary herein, and without prejudice to any rights or remedies otherwise available to the Seller, the Buyer, by its acceptance of these conditions, expressly agrees that Seller has the sole discretion to cancel or to adjust prices in the event the Vessel is suffering a delay exceeding 24 hours from the (last) nomination date.

O.2      If the Buyer for whatever reason (including circumstances entirely outside Buyer's control) cancels the Agreement, where Order Confirmation has been sent by Seller, the Buyer shall be liable for any and all losses suffered and liabilities incurred by the Seller and/or the Supplier as a result of such cancellation, including, but not limited to, barge costs, re-storing of the Bunkers, and hedging costs, and also in Seller's sole option any difference between the contract price of the undelivered product and the amount received by the Seller upon resale to another party or, if another buyer cannot be found, any market diminution in the value of the product as reasonably determined from available market indexes. These losses and liabilities shall be indemnified by a minimum amount of USD 4,000 by way of agreed minimum liquidated damages, and shall be indemnified in full if they in total exceed USD 4,000.

**P,**     **LAW AND JURISDICTION**

P.1      This Agreement shall be governed and construed in accordance with English law, The 1980 United Nations Convention on Contracts for the International Sale of Goods (CISG) shall not apply.
Except for circumstance referred to in Clause P.5 below all disputes arising in connection with this Agreement or any agreement relating hereto, save where the Seller decides otherwise in its sole discretion, shall be finally settled by arbitration in London, England in accordance with the Arbitration Act 1996 (or any subsequent amendment).

P.2      In the event that the Seller determines to refer any dispute to arbitration it shall be referred to a tribunal of three arbitrators consisting of one arbitrator to be appointed by the Seller, one by the Buyer, and one by the two arbitrators already appointed. Each member of the tribunal shall be a full member of The London Maritime Arbitrators Association (the "LLMA"). Either party may call for Arbitration by service of written notice, specifying the name and address of the arbitrator appointed and a brief description of the dispute(s) or difference(s) to be the subject of the Arbitration. If the other party does not within 14 days serve notice of appointment of an arbitrator to arbitrate the dispute(s) or difference(s), then the first moving party shall have the right without further notice to appoint its own arbitrator as sole arbitrator and shall subsequently advise the other party accordingly. The award of the sole arbitrator shall be binding on both parties as if he had been appointed by agreement. Provided each party appointed their own arbitrator then these two arbitrators shall jointly appoint the third arbitrator. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either party may apply to the English courts for the appointment of a third arbitrator.
Any disputes to be referred to Arbitration are to be determined in accordance with the current LMAA terms unless the parties agree otherwise.

P.3      Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

P.4      In cases where neither the claim nor any counterclaim exceeds the amount of USD 100,000 (or such other sum as the parties may agree) the Arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

P.5      The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Seller shall be entitled to assert

its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any jurisdiction where the Vessel may be found.

Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them, any dispute and/or claim arisen in connection with a Vessel detained by Seller at any port, place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York.

P.6       If any procedure of any nature whatsoever is instituted under Clause P.5 above, in connection with any controversy arising out of this Agreement or to interpret or enforce any rights under this Agreement, the prevailing party shall have the right to recover from the losing party its reasonable costs and attorneys' fees incurred in such proceeding.

## Q.       VALIDITY

Q.1       These terms and conditions shall be valid and binding for all offers, quotations, prices and deliveries made by the O.W. Bunker Group, any associated company, representative or agent as of September 1, 2013, or at any later date.

Q.2       These terms and conditions are available at the website www.owbunker.com, on which site as well the Sellers may notify amendments, alterations, changes or verifications to same. Such amendments, alterations, changes or verifications are deemed to be a part of the entire terms once same have been advised on the website.

# Exhibit2

**O.W. Bunker Germany GmbH**
**WW Division**

**⊕ Bunker**

Hapag-Lloyd AG
Ballindamm 25
D-20095 Hamburg
Germany

Neumühlen 11
D-22763 Hamburg
Germany
Phone: +49 40 3256900
Fax: +49 40 330471
Tax No. / Steuer Nr. 41/766/03456
E-mail: trading@owbunker.de
Internet: http://www.owbunker.com
Managing director: Götz Lehsten
HR B 100089
ING Bank N.V.
IBAN: NL26 INGB 0020 1180 31
IBAN: NL10 INGB 0651 3696 81
SWIFT: INGBNL2A

## Sales Order Confirmation

Sales Order No.   119-28384

We are hereby pleased to acknowledge receipt of your order as follows:

Hamburg   28. October 2014

| | |
|---|---|
| Vessel | DERBY D. (IMO: 9278117) |
| Port | HOUSTON |
| Delivery date | 5. November 2014 |
| Seller | O.W. Bunker Germany GmbH |
| Your ref. | |
| Account | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV DERBY D. AND/OR HAPAG-LLOYD AG |

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 50,00 | MT | Gasoil 0,1% | USD | 804,00 | MT | O'Rourke Delivery : Barge |

| | |
|---|---|
| Agent | Norton Lilly |
| Payment | WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX). COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME. |
| Remarks | all per ISO8217 2005(E) HALO GTC2005(E) shall apply. |

We thank you for this nomination.

Kind Regards

Karl Heinz Selmer

| | |
|---|---|
| Direct | +49 4032 5590 12 |
| Mobile | +49 151 276 276 80 |
| Yahoo ID | khse_owbunker |
| E-Mail | khse@owbunker.de |
| Office E-Mail | trading@owbunker.de |

**O.W. Bunker Germany GmbH**
**WW Division**

 **Bunker**

TERMS AND CONDITIONS.
-------------------------------------------

SAMPLES:

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any dispute regarding quality to be settled by testing these retained samples by an independent laboratory at port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

TERMS:

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as 'Buyer' and to O.W. Bunker Germany GmbH as 'Seller'.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

GUIDELINES FOR RECEIVING BUNKERS:

We strongly urge you to forward the information regarding: General Instructions and Guidelines for Bunkering, for Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard,Following the suggested Guidelines should minimize risk of quantity disputes.Please bear in mind that barge figures are the sole valid quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

OTHERWISE:

Any errors or omissions in above Confirmation should be reported immediately.


PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR UNDERSTANDING.

**O.W. Bunker Germany GmbH**
**WW Division**



GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

BEFORE BUNKERING:

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge. If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified.

Make sure to witness and verify initial measurements and ullaging onboard the barge before. ALL tanks to be checked and measured including actual temperature of cargo -- also including those tanks said not to be included in the particular supply (idle tanks). Compare measurements and verify the quantities as per barge ullage tables. When in full agreement please sign the ullage/sounding report for Before Supply figures. If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt).

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures.

DURING BUNKERING:

Always place a watchman to witness safe operation including also proper and correct sampling. The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling. Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labeling and sealing of ALL samples. Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes. All seal numbers to be inserted into the Bunker Delivery Receipt (BDR). The MARPOL sample must be one of those samples drawn under witnessing.

The watchman must pay special attention to the bunker hose, and any un-agreed attempts to transfer air via same should cause immediate stoppage unless the use of air is caused by stripping of barge tanks, which stripping to be agreed in advance by both parties. If air is blown on continued basis, and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain the time (hours from/to) that airblow was notified.

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply. Pay special attention hereto and take all necessary precautions to observe, which includes:
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging.
- Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge.
- Agree with the barge when and if they are going to make stripping of their tanks.
- Check and note the draft fore, mid and aft on the barge before and after supply to compare.
- If any signs at all of cappucino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far.
- Contact vessel operator in charge and request notification to the Seller and Supplier immediately.
- If surveyor attending please ensure that the surveyor signs a Letter of Protest also.
- After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master.

AFTER COMPLETION:

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank. Make sure also on completion to verify contents of ALL tanks, including those being idle.

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor. If disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply.

QUANTITY COMPLAINTS:

Receiving Vessel to inform discrepancies in writing latest upon completion of taking the bunkers.

100894



**BUNKER DELIVERY NOTE**

| VESSEL NAME Deeby O | | | DATE 11-6-14 | | EX WHARF ☒ | EX BARGE ☐ |
|---|---|---|---|---|---|---|
| FLAG | IMO # 9278117 | | AGENT Norton Lilly | | BARGE NAME Oms | |
| FOR ACCOUNT OF | | | DELIVERY LOCATION Barbours Cut Terminal | | | |

| | TEMP °F. | GRAVITY A.P.I. @ 60°F | DENSITY @ 15°C, Kg/m³ | BARRELS PER MT | NET VOLUME IN BARRELS | METRIC TONS ORDERED | METRIC TONS DELIVERED |
|---|---|---|---|---|---|---|---|
| PRODUCT MGO | | 36.3 | 845.3 | 7.4657 | 353 | 50 | 47.28 |
| PRODUCT | | | | | | | |
| PRODUCT | | | | | | | |

| | | | PRODUCT | PRODUCT | PRODUCT |
|---|---|---|---|---|---|
| ARRIVAL ALONGSIDE 23:55 | 20 | | MGO | | |
| TRUCK START 01:13 | 20 | Cst VISCOSITY @ 40°C | 2.524 | | |
| TRUCK FINISH 01:44 | 20 | FLASH °F min | 147°F | | |
| TRUCK START 01:52 | 20 | SULPHUR % (m/m) | 0.0008% | | |
| TRUCK FINISH 02:38 | 20 | WATER % (v/v) | Nil | | |
| DEPARTURE TIME 03:30 | 20 | | | | |

PROPERTIES

Remarks:

| Product Grade | Marpol Sample # | Vessel Sample # | OMS/Retain Sample # | Other |
|---|---|---|---|---|
| MGO | 50018769 | 50018140 | 50018160 | |

The fuel supplied in this delivery is in conformity with regulation 14(1) and regulation 18(1) of annex VI Marpol 73/78 effective May 19, 2005.

The undersigned also certifies that the quantity/grade received is in accordance either the vessel's requirements, any advice from the owners/charterers to the contrary not withstanding.

The undersigned certifies that this property is for use solely in the operation of said vessel in foreign or interstate coastwise commerce. It is further certified that said vessel is engaged exclusively in foreign or interstate commerce. Any purchaser who fraudulently signs this certificate without intent to use the property purchased as above stated shall be subject to all penalties provided by law.

No disclaimer stamp of any type or form will be accepted on the bunker receipt, nor should any stamp be applied, will it alter change or waive the sellers maritime lien against the vessel, or waive the vessel's ultimate responsibility for the debt incurred thru this transaction.

SIGNATURE BELOW ACKNOWLEDGES THAT YOU HAVE RECEIVED A COPY OF OUR GENERAL TERMS AND CONDITIONS. ANY OFFER TO SELL TO CUSTOMER IS SUBJECT TO AND INCORPORATES BT REFERENCE ALL OF O'ROURKE MARINE SERVICES, L.P., L.L.P. CURRENT GENERAL TERMS AND CONDITIONS. ACOPY OF WHICH IS APPENDED HERETO OR AVAILABLE FROM O'ROURKE MARINE SERVICES, L.P., L.L.P.

| THE FOREGOING DELIVERED TO VESSEL SIGNED | TITLE Bunkerman | DATE 11-6-14 |
|---|---|---|

| THE FOREGOING RECEIVED ON BOARD VESSEL SIGNED | TITLE Chief Engineer | DATE 11-6-14 |
|---|---|---|

# Invoice

Page: 1

REMIT TO:

**O'ROURKE MARINE SERVICES**

P.O. BOX 301457
DALLAS, TX 75303-1457
(281) 695-1005

*www.orpp.com*

| | |
|---|---|
| Invoice Number: | 0025462 |
| Invoice Date: | 11/10/2014 |
| Invoice Due Date: | 11/15/2014 |
| Ship Date: | 11/6/2014 |
| Order Number: | 0025462 |
| Order Date: | 10/27/2014 |
| Salesperson: | M104 |
| Customer Number: | OWB100M |

Sold To:

O.W. BUNKER USA INC,
2603 AUGUSTA DR, STE 440
HOUSTON, TX 77057
(281) 946-2300

Ship To:

O.W. BUNKER USA INC.
PORT OF HOUSTON
HOUSTON, TX

Confirm To:

| Customer P.O. | Terms | Area & Block | Rig Vessel Name | Meter Ticket No. |
|---|---|---|---|---|
| 172-13225 | ACH NET 5 DAYS | | DERBY D. | |

| Item Number | Description | UOM | Quantity | Unit Price | Ext Price |
|---|---|---|---|---|---|
| 03M | MGO | Metric Tons | 47.28 | 826.14 | 39,059.90 |
| | Dyed Diesel Fuel, Nontaxable Use Only, Penalty for Taxable Us | | | | |

PLATTS CLOSE 2.5147 + (.12) = 2.6347

| | |
|---|---|
| FEDERAL LUST FEE | 14.83 |
| FEDERAL OIL SPILL FEE | 28.17 |
| | 39,102.90 |

MT CONVERSION      7.4657 x 42 = 313.56 (GALS PER TON) x 2.6347 = 826.14 ($ PER TON)

## *Always fulfilling our brand promise to you*
## *Safe. FAST. Efficient.*

Invoice Total:      39,102.90

ACH/WIRE
TRANSFER
INFORMATION:

JP Morgan Chase Bank,
Houston, Texas 77002
ABA Routing #: 111000614 (ACH ONLY)
ABA Routing #: 021000021 (WIRE ONLY)
Account #: 00708101902

THANK YOU FOR YOUR BUSINESS

# Exhibit 3

**O.W. Bunker Germany GmbH**
**WW Division**

**(W) Bunker**

Hapag-Lloyd AG
Ballindamm 25
D-20095 Hamburg
Germany

Neumühlen 11
D-22763 Hamburg
Germany
Phone: +49 40 3266900
Fax: +49 40 330471
Tax No. / Steuer Nr. 41/768/03458
E-mail: trading@owbunker.de
Internet: http://www.owbunker.com
Managing director: Götz Lehsten
HR B 100089
ING Bank N.V.
IBAN: NL26 INGB 0020 1180 31
IBAN: NL10 INGB 0651 3696 81
SWIFT: INGBNL2A

## Sales Order Confirmation

Sales Order No.      119-28363

We are hereby pleased to acknowledge receipt of your order as follows:                Hamburg   28. October 2014

| | |
|---|---|
| Vessel | SYDNEY EXPRESS (IMO: 9062984) |
| Port | HOUSTON |
| Delivery date | 3. November 2014 |
| Seller | O.W. Bunker Germany GmbH |
| Your ref. | |
| Account | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV SYDNEY EXPRESS AND/OR HAPAG-LLOYD AG |

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 170,00 | MT | Gasoil 0,1% | USD | 800,00 | MT | O'Rourke |

| | |
|---|---|
| Agent | NORTON LILLY |
| Payment | WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX), COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME. |
| Remarks | all per ISO8217 2005(E) HALO GTC2007 shall apply |

We thank you for this nomination.

Kind Regards

Karl Heinz Selmer

| | |
|---|---|
| Direct | +49 4032 5590 12 |
| Mobile | +49 151 276 276 80 |
| Yahoo ID | khse_owbunker |
| E-Mail | khse@owbunker.de |
| Office E-Mail | trading@owbunker.de |

## O.W. Bunker Germany GmbH
## WW Division



TERMS AND CONDITIONS.
---------------------------------------

**SAMPLES:**

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified quantities as noted in the BDR aswell as those samples taken are the only ones deemed representative, and any dispute regarding quality to be settled by testing these retained samples by an independent laboratory at port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

**TERMS:**

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as 'Buyer' and to O.W. Bunker Germany GmbH as 'Seller'.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01082013.pdf

**GUIDELINES FOR RECEIVING BUNKERS:**

We strongly urge you to forward the information regarding: General instructions and Guidelines for Bunkering, for Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard. Following the suggested Guidelines should minimize risk of quantity disputes. Please bear in mind that barge figures are the sole valid quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

**OTHERWISE:**

Any errors or omissions in above Confirmation should be reported immediately.

PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR UNDERSTANDING.

**O.W. Bunker Germany GmbH**
**WW Division**



GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

BEFORE BUNKERING:

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge. If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified.

Make sure to witness and verify initial measurements and ullaging onboard the barge before. ALL tanks to be checked and measured including actual temperature of cargo – also including those tanks said not to be included in the particular supply (idle tanks). Compare measurements and verify the quantities as per barge ullage tables. When in full agreement please sign the ullage/sounding report for Before Supply figures. If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt).

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures.

DURING BUNKERING:

Always place a watchman to witness safe operation including also proper and correct sampling. The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling. Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labeling and sealing of ALL samples. Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes. All seal numbers to be inserted into the Bunker Delivery Receipt (BDR). The MARPOL sample must be one of these samples drawn under witnessing.

The watchman must pay special attention to the bunker hose, and any un-agreed attempts to transfer air via same should cause immediate stoppage unless the use of air is caused by stripping of barge tanks, which stripping to be agreed in advance by both parties. If air is blown on continued basis, and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain the time (hours from/to) that airblow was notified.

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply. Pay special attention hereto and take all necessary precautions to observe, which includes;
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging.
- Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge.
- Agree with the barge when and if they are going to make stripping of their tanks.
- Check and note the draft fore, mid and aft on the barge before and after supply to compare.
- If any signs at all of cappuccino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far.
- Contact vessel operator in charge and request notification to the Seller and Supplier immediately.
- If surveyor attending please ensure that the surveyor signs a Letter of Protest also.
- After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master.

AFTER COMPLETION:

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank. Make sure also on completion to verify contents of ALL tanks, including those being idle.

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor. If disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply.

QUANTITY COMPLAINTS:

Receiving Vessel to inform discrepancies in writing latest upon completion of taking the bunkers.



101026

**BUNKER DELIVERY NOTE**

53,171 GROSS METER STOP

| VESSEL NAME SYDNEY EXPRESS | | | DATE 11-4-14 | | EX WHARF ☐ EX BARGE ☐ | | |
|---|---|---|---|---|---|---|---|
| FLAG | IMO # 9062984 | | AGENT NORTON LILLY | | BARGE NAME CCL 14 | | |
| FOR ACCOUNT OF O.W. BUNKER USA | | | DELIVERY LOCATION BARBOURS CUT #4 | | | | |
| | TEMP °F. | GRAVITY A.P.I. @ 60°F | DENSITY @ 15°C, Kg/m³ | BARRELS PER MT | NET VOLUME IN BARRELS | METRIC TONS | |
| | | | | | | ORDERED | DELIVERED |
| PRODUCT DMA | | 35.9 | .845 | 7.447 | | 170 | 170 |
| PRODUCT | | | | | | | |
| PRODUCT | | | | | | | |

| | | | | PRODUCT | PRODUCT | PRODUCT |
|---|---|---|---|---|---|---|
| ARRIVAL ALONGSIDE 1915/1925 | 20 14 | | | DMA | | |
| TRUCK START 2030 | 20 14 | P R O P E R T I E S | Cst VISCOSITY @ 40°C | 4.088 | | |
| TRUCK FINISH 2210 | 20 14 | | FLASH °F min | 170 | | |
| TRUCK START | 20 | | SULPHUR % (m/m) | 0.092 | | |
| TRUCK FINISH | 20 | | WATER % (v/v) | NIL | | |
| DEPARTURE TIME 2250 | 20 14 | | | | | |

M.V. SYDNEY EXPRESS
STAMP
CHIEF ENGINEER

Remarks: VSL SIGNED ONLY FOR.
Vol. Reps @ Resp. Temp.

| Product Grade | Marpol Sample # | Vessel Sample # | OMS/Retain Sample # | Other |
|---|---|---|---|---|
| DMA | 50022297 | 50022262 | 50018954 | |

The fuel supplied in this delivery is in conformity with regulation 14(1) and regulation 18(1) of annex VI Marpol 79/78 effective May 19, 2005.

The undersigned also certifies that the quantity/grade received is in accordance either the vessel's requirements, any advice from the owners/charterers to the contrary not withstanding.

The undersigned certifies that this property is for use solely in the operation of said vessel in foreign or interstate coastwise commerce. It is further certified that said vessel is engaged exclusively in foreign or interstate commerce. Any purchaser who fraudulently signs this certificate without intent to use the property purchased as above stated shall be subject to all penalties provided by law.

No disclaimer stamp of any type or form will be accepted on the bunker receipt, nor should any stamp be applied, will it alter change or waive the sellers maritime lien against the vessel, or waive the vessel's ultimate responsibility for the debt incurred thru this transaction.

SIGNATURE BELOW ACKNOWLEDGES THAT YOU HAVE RECEIVED A COPY OF OUR GENERAL TERMS AND CONDITIONS. ANY OFFER TO SELL TO CUSTOMER IS SUBJECT TO AND INCORPORATES BT REFERENCE ALL OF O'ROURKE MARINE SERVICES, L.P., L.L.P CURRENT GENERAL TERMS AND CONDITIONS. ACOPY OF WHICH IS APPENDED HERETO OR AVAILABLE FROM O'ROURKE MARINE SERVICES, L.P., L.L.P.

THE FOREGOING DELIVERED TO VESSEL.

| SIGNED | TITLE TKM/PIC | DATE 11-4-14 |
|---|---|---|

THE FOREGOING RECEIVED ON BOARD VESSEL

| SIGNED | TITLE C.E. | DATE 04-11-14 |
|---|---|---|

**REMIT TO:**

# Invoice

Page: 1

**O'ROURKE MARINE SERVICES ☒ ☒ ☒**

P.O. BOX 301457
DALLAS, TX 76303-1457
(281) 695-1005

*www.orpp.com*

| | |
|---|---|
| Invoice Number: | 0025463 |
| Invoice Date: | 11/10/2014 |
| Invoice Due Date: | 11/15/2014 |
| Ship Date: | 11/4/2014 |
| Order Number: | 0025463 |
| Order Date: | 10/27/2014 |
| Salesperson: | M104 |
| Customer Number: | OWB100M |

**Sold To:**

O.W. BUNKER USA INC.
2603 AUGUSTA DR, STE 440
HOUSTON, TX 77057
(281) 946-2300

**Confirm To:**

**Ship To:**

O.W. BUNKER USA INC.
MIDSTREAM
GALVESTON, TX

| Customer P.O.<br>172-13224 | Terms<br>ACH NET 5 DAYS | Area & Block | Rig Vessel Name<br>SYDNEY EXPRESS | | Meter Ticket No. |
|---|---|---|---|---|---|
| Item Number | Description | UOM | Quantity | Unit Price | Ext Price |
| 104 | DMA-ISO 8217-2010 DIESEL FUEL | Metric Tons | 170.00 | 824.06 | 140,090.20 |

PLATTS CLOSE 10/29   2.5147 + (.12) = 2.6347

| | |
|---|---|
| FEDERAL LUST FEE | 53.17 |
| FEDERAL OIL SPILL FEE | 101.02 |
| | 140,244.39 |

MT PRICING        70447 x 42 = 312.77 (GALS PER TON) x 2.6347 = 824.06 ($ PER TON)

# *Always fulfilling our brand promise to you*
## *Safe. FAST. Efficient.*

Invoice Total:        140,244.39

**ACH/WIRE TRANSFER INFORMATION:**
JP Morgan Chase Bank,
Houston, Texas 77002
ABA Routing #: 111000614 (ACH ONLY)
ABA Routing #: 021000021 (WIRE ONLY)
Account #: 00708101902

THANK YOU FOR YOUR BUSINESS

IZ-2014  13:30        HAPAG-LLOYD RECHNUNGSW.          +49 40 30012261    S.01

JN dW 1o11o6
[515 216

gebucht      (W) Bunke

0 2. Dez. 2014
M. Fokowski

M/V  SYDNEY EXPRESS
AND/OR OWNERS/CHARTERERS

Hapag-Lloyd AG                              DATE OF INVOICE  :  04. November 2014
1300 Accounting
Ballindamm 25              Hapag-Lloyd AG    INVOICE NO       :  119-29524
D-20095 Hamburg             Accounting
Germany                    2 5. Nov. 2014    ORDER NO.        :  119-28363

                              EINGANG        DATE OF SUPPLY   :  04. November 2014

PORT: HOUSTON                                DUE DATE         :  04. December 2014
YOUR REFERENCE: 028/4504080277

| Quantity supplied | Quality/description | Price/per | Invoice amount |
|---|---|---|---|
| 170,000 MT | Gasoil 0,1% | 800,00 MT | 136.000,00 |
| | Nicht steuerbare Lieferung im Ausland / Non-taxable delivery abroad | | |

1,25130

HL00100187521611

| Your VAT No. | DE 813960018 | VAT Amount | USD | 0,00 |
|---|---|---|---|---|
| Our VAT No. | DE814847085 | Total | USD | 136.000,00 |

The prices are excl. all taxes and/or other fees.

TERMS OF PAYMENT 30 days from date of delivery With value date not later than DUE DATE or previous working day
when it is a holiday. In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions

BANK:      ING Bank N.V.                        O.W. BUNKER GERMANY
                                                Neumü
ACCOUNT:   IBAN: NL26 INGB 0020 1180 31    USD and all other currencies    D-22769 H
           IBAN: NL10 INGB 0651 3696 81    EUR
                                                Phone: +49 40 3:
           SWIFT: INGBNL2A                       Fax: +49 40.

                                                Tax No. / Steuer Nr. 41/760

                                                E-mail: trading@owbu
                                                Internet: http://www.owbunk

                                                Managing director: Götz I
                                                              HR A
Per telegraphic transfer directly to our account without deduction        GESAMTSEITEN